# IN THE SUPREME COURT OF MISSISSIPPI

*STANLEY J. DANIELS, a/k/a RIP DANIELS; BOYD C.*
*JAMES, III; EMILE HOSKINS; GARY HOLLOWAY;*
*DIXIE DANIELS AND WILLIE WHITLOCK*

*v.*

*ITS OFFICIAL CAPACITY*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/11/96 |
| TRIAL JUDGE: | HON. ROBERT H. WALKER |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | CAROL L. HENDERSON |
| ATTORNEY FOR APPELLEE: | JOSEPH R. MEADOWS |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED - 9/17/1998 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 10/8/98 |

**BEFORE PRATHER, C.J., SMITH AND WALLER, JJ.**

**PRATHER, CHIEF JUSTICE, FOR THE COURT:**

## I. STATEMENT OF THE CASE

¶1. Stanley Daniels and five co-plaintiffs filed suit against the Harrison County Board of Supervisors, seeking to enjoin the Board from "carrying through with their intentions to fly the Confederate Battle Flag on the Mississippi Beaches and other public property located within Harrison County." The Confederate Flag was and is currently being displayed on a portion of the Gulf Coast beach known as "Eight Flags." The flags displayed at this location represent the eight governments, including the Confederate States of America, which have, at some point in history, claimed sovereignty over this area of the State.

¶2. On September 11, 1996, the Circuit Judge entered an order granting the Board's motion for summary judgment, ruling that the display of the Confederate Flag by the Board was not prohibited by law, statutory or otherwise. Daniels appealed the trial judge's ruling to this Court.

## II. ISSUES

**A. Whether the circuit court erred by ignoring *inclusio unius est exclusio alterius* in its analysis and construction of Miss. Code Ann. § 3-3-15 (1972).**

¶3. This Court employs a *de novo* standard in reviewing a trial court's grant of a motion for summary judgment. Summary judgment is proper where there exist no genuine issues of material fact and judgment may be rendered as a matter of law. *Mississippi Ethics Com'n v. Aseme*, 583 So.2d 955, 957 (Miss. 1991). In the present appeal, there are no disputed issues of fact, and this Court is presented with a question of law.

¶4. Daniels argues that the display of the Confederate Battle Flag at Eight Flags is barred by a proper interpretation of statute. Specifically, Daniels argues that the trial court erred in failing to apply the doctrine of *inclusio unius est exclusio alterius* in its interpretation of Miss. Code Ann. § 3-3-15 (1972). MCA § 3-3-15 provides that:

> The state flag may be displayed from all public buildings from sunrise to sunset; however, the state flag may be displayed from all public buildings twenty-four hours a day if properly illuminated. The state flag should not be displayed when the weather is inclement, except when an all-weather flag is displayed. The state flag shall receive all of the respect and ceremonious etiquette given the American flag. Provided, however, nothing in this section shall be construed so as to affect the precedence given to the flag of the United States of America.

Daniels notes that this Court held in *Lee v. Alexander*, 607 So.2d 30, 36 (Miss. 1992) that "(w)here a statute enumerates and specifies the subject or things upon which it is to operate, it is to be construed as excluding from its effect all those not expressly mentioned or under a general clause . . ." Daniels concludes that, based upon this doctrine of statutory interpretation, "it is thus clear that MCA § 3-3-15 must be construed as excluding the Confederate or battle flag from its effect or delineating conditions under which the state flag may be flown."

¶5. This argument is without merit. In the view of this Court, MCA § 3-3-15 can not validly be interpreted as prohibiting the display of the Confederate Battle flag or any other flag. This statute was written to set guidelines for the display of the Mississippi state flag in a proper and respectful manner, and it contains no provisions which limit the display of other flags. It is clear that MCA § 3-3-15 is a statute of very limited scope, and there is nothing in its language to indicate that it should be broadly "interpreted" to bar the display of the Confederate Flag. The Circuit Judge correctly stated in his ruling granting summary judgment that there was "no violation" of the "statutes underpinning Plaintiff's complaint," and this point of error is accordingly overruled.

**B. Whether the use of public funds to display a racially-offensive historical symbol violates public policy and existing case law.**

¶6. Daniels argues that there are "compelling public policy" considerations against the display of the Confederate Flag at Eight Flags. Specifically, Daniels argues that:

> The message sent by a local government's flying of the Confederate flag serves to chill its African-American citizens' exercise of their right to the franchise and to petition government for redress of grievances.

Daniels submits that the display of the Confederate Flag at Eight Flags is offensive to many residents of the Gulf Coast, particularly those of African-American descent. Nevertheless, he fails to cite any basis on which this Court might conclude that the display of this flag is unlawful.

¶7. The only authority cited by Daniels in this point of error is the United States Supreme Court decision in *U.S. v. Carolene Products Co.*, 304 U.S. 144 (1938), but this decision has little if any factual similarity or relevance to the present case. Moreover, Daniels' argument that the flying of the single Confederate flag at Eight Flags "serves to chill its African-American citizens's exercise of their right to the franchise and to petition government for redress of grievances" has been rejected by at least one Federal Court of Appeals in a similar context.

¶8. In *NAACP v. Hunt*, 891 F.2d 1555 (11th Cir. 1990), the Eleventh Circuit Court of Appeals rejected an attempt by the NAACP to bar the display of the confederate flag by the State of Alabama based upon many of the same Constitutional arguments presented herein. In *Hunt*, the Court of Appeals held that the present issue was a "political matter," the remedy for which lies within the democratic process ... and the voting rights of all its citizens." *Hunt*, 891 F.2d at 1565. The Eleventh Circuit concluded that "(t)he federal judiciary is not empowered to make decisions based on social sensitivity. Because the NAACP has advanced no proof that the flag prohibits its members from speaking or punishes them from speaking, the district court properly granted summary judgment." *Id.*

¶9. As in *Hunt*, the record in the present case contains no indication that the flying of the single Confederate Flag at Eight Flags serves to deprive any citizens of this State of any constitutionally protected right. Daniels is unable to present any applicable constitutional, statutory, or common law authority to support his position. The circuit judge correctly ruled that "(n)either the Plaintiffs disapproval of the Board's choice of the battle flag to represent the Confederacy, of which Mississippi was undeniably a part, nor their finding the Board's choice offensive, makes the Board's action unlawful." The ruling of the trial court is affirmed.

¶10. **JUDGMENT IS AFFIRMED.**

**SULLIVAN AND PITTMAN, P.JJ., BANKS, ROBERTS, SMITH, MILLS AND WALLER, JJ., CONCUR. McRAE, J., CONCURS IN RESULT ONLY. BANKS, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION.**


**BANKS, JUSTICE, SPECIALLY CONCURRING:**

¶11. While I agree with the result reached by the majority, I write separately to express my concerns regarding the insensitivity inherent in this issue.

¶12. Harrison County, over the apparent objection of some of its citizens, persists in flying the Confederate battle flag at a publicly owned facility. According to its brief the battle flag is flown to represent one of the eight governments which at one time or another claimed sovereignty over the area. While of little legal significance, the historical accuracy of this assertion is of some interest.

¶13. The first official flag of the Confederacy was the "Stars and Bars," which was used as the official flag from March 1861 to May 1863. On May 1, 1863, a second design was adopted as the official flag of the Confederacy. This flag included the battle flag emblem (a/k/a the "Southern Cross"). Finally on March 4, 1865, a short time before the defeat of the Confederacy, a third pattern was adopted as the official flag of the Confederate States of America. This flag also included the "Southern Cross" battle flag emblem, along with a broad bar of red on the fly end of the white field. Thus, the flying of the Confederate battle flag at "Eight Flags" to represent the Confederate States of America which presumably claimed sovereignty over that area at some point in time is historically inaccurate.

¶14. The Confederate battle flag was "initially designed as a rallying symbol for Confederate troops heading into battle" to fight for, among other things, the right to continue the institution of slavery. *See* James Forman, Jr., *Driving Dixie Down: Removing the Confederate Flag from Southern State Capitols*, 101 Yale L.J. 505, 513-14 (1991). Since the defeat of the Confederate States of America, the Confederate battle flag has been used throughout history, not only to commemorate the sacrifices made in support of the cause of the Confederacy, but -- most prominently -- as a symbol of white supremacy.

¶15. Quite recently, many state governments adopted the battle flag as a symbol of continued support of white supremacy, segregation and discrimination against persons of black African descent. For example, the Georgia state flag was redesigned to look like the Confederate battle flag following the United States Supreme Court decision in ***Brown v. Board of Education of Topeka***, 349 U.S. 294 (1955). The Confederate battle flag was raised in Alabama in 1963 by Governor Wallace as part of his "Segregation Forever" campaign. No "johnny-come-lately" by any means, this state adopted the present-day flag which incorporates the Confederate battle flag emblem in 1894, following the adoption of the 1890 Constitution which had the purpose and effect of institutionalizing white supremacy.[(1)]

¶16. Even more recently, notorious and violent white supremacist groups have proudly adopted the Confederate battle flag as their symbol. *See* John M. Glionna, *Unfavorite Son*, L.A. TIMES, Oct. 30, 1990, at E1 (Tom Metzger, former Grand Dragon of the Ku Klux Klan and leader of the White Aryan Resistance who was ordered to pay $12.5 million in damages for his role in the killing of a black man in Oregon flew the Confederate battle flag above his home); Paul W. Valentine, *Police Boost Security at NAACP*, WASH. POST, Jan. 5, 1990, at CI (Ku Klux Klan and neo-Nazi protestors demonstrating outside the national headquarters of the NAACP carried a Confederate battle flag along with signs saying "Nuke the NAACP"); *Town Closes Shops to Protest Neo-Nazi March*, L.A. TIMES, Oct. 8, 1989, at A28 (two hundred members of the neo-Nazi, Aryan Nations organization carrying Confederate battle flags and wearing Klan robes and Nazi uniforms commemorated Confederate war hero Sam Davis' birthday in Pulaski, Tennessee, the birthplace of the Klan); Ashley Dunn & Jeffrey Miller, *"I Had to Stop it," Says Guard Who Held Off Alleged "Skinheads"*, L.A. TIMES, June 1, 1989, at B1 (a group of Los Angeles skinheads wearing Confederate battle flag tattoos attacked a Middle Eastern couple and baby in a supermarket parking lot); Dan Morain & Robert Chow, *Rain Dampens Event as Foes Outnumber "Skinheads" at Rally*, L.A. TIMES, Mar. 5, 1989, at A3 (group of fifty white racists and skinheads celebrated an "Aryan Woodstock"; many wore the Confederate battle flag and other racist and anti-Semitic symbols); Louis Sahagun, *Marchers in Fontana Fete King, Draw Klan Taunts*, L.A. TIMES, Jan. 18, 1988, at

A3 (the Imperial Wizard of the Invisible Empire of the Knights of the Ku Klux Klan, J.W. Farrands, sporting a Confederate battle flag button on his lapel flew from his home in Connecticut to California to protest Martin Luther King's birthday); Mary Jordan & Linda Wheeler, *14 Hurt as Anti-Klan Protestors Clash with Police*, WASH. POST, Oct. 29, 1990, at A1 (members of the Ku Klux Klan have marched from the Washington Monument to the Capital carrying a Confederate battle flag and chanting "We are the KKK").

¶17. Thus, it is understandable to say the least that there is a large segment of Mississippi's citizenry which finds the state flag offensive and objectionable. The Eleventh Circuit Court of Appeals in *NAACP v. Hunt*, 891 F.2d 1555 (11th Cir. 1990) recognized that "[c]itizens of all races" are offended by the Confederate battle flag. *Id.* at 1562. Similarly in *Coleman v. Miller*, 117 F.3d 527, 530 (11th Cir. 1997), that same court -- rejecting a group of African Americans' challenge to the flying of the flag in Georgia -- stated thusly:

> We recognize that the Georgia flag conveys mixed meanings; to some it honors those who fought in the Civil War and to others it flies as a symbol of oppression. But because the Confederate battle flag emblem offends many Georgians, it has, in our view, no place in the official state flag. We regret that the Georgia legislature has chosen, and continues to display, as an official state symbol a battle flag emblem that divides rather than unifies the citizens of Georgia. . . .

¶18. Some may theorize to the contrary, but the bottom line is that the Confederate battle flag conjures up images of and is popularly used to symbolize slavery, white supremacy, racism and oppression. It takes no back seat to the Nazi Swastika in this regard. Nevertheless, a common argument in favor of the flag is that it represents a piece of Southern history that should not be forgotten.

¶19. I have no qualms with preserving history. Such symbols as the Confederate flag and the Nazi swastika are appropriate in museums, exhibits and the like. I do not believe, however, that it is appropriate public policy to continue to fly the Confederate battle flag at government facilities. To continue to do so under the shibboleth of "preserving tradition" readily lends itself to negative connotations that, with good reason, offend a large number of Mississippi citizens -- sending a message that their feelings do not matter. One can only wonder what role such divisiveness plays in the problems which continue to plague our state.

¶20. That said, I agree with the majority here and the *Hunt* court that the judiciary is not the avenue to effectuate the removal of the Confederate battle flag from public property. Instead, Mr. Daniels and others like him who are compelled to voice their objection to the battle flag should look to the legislature because the legislature is the primary expositor of this state's public policy.[(2)] If, by its choice of symbols, the legislature announces a public policy of insensitivity to persons still reeling from the effects of hundreds of years of a pernicious system of oppression based upon race, so be it. The world should and will take note.

1. The Mississippi Official and Statistical Register 1996-2000 reports the origin of our state's flag

thusly:

> The committee recommended for the flag "one with width two-thirds of its length; with the union square, in width two-thirds of the width of the flag; the ground of the union to be red and a broad blue saltier thereon, bordered with white and emblazoned with thirteen mullets or five-pointed stars, *corresponding with the number of the original states of the Union*."

(emphasis added) How many Mississippians are aware of the fact that the thirteen stars on the Mississippi flag purportedly represent, not the states of the Confederacy, but the original thirteen states of the Union?

2. Some administrative and legislative bodies have taken action with respect to this flag. Notably the administration at the University of Mississippi has made it clear that the confederate battle flag has no official status at the University of Mississippi and has taken steps to discourage its continued use by alumni and others at the University of Mississippi functions. Similarly, the Jackson Municipal Separate School District school board removed the rebel flag as a symbol for one of its high schools several years ago.