United States Court of Appeals
Fifth Circuit

**F I L E D**

**June 3, 2003**

Charles R. Fulbruge III
Clerk

REVISED JUNE 6, 2003

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

No. 02-60737
Summary Calendar

---

JOHN ELLIS BRIGGS,

Plaintiff-Appellant,

versus

STATE OF MISSISSIPPI,

Defendant-Appellee.

---

Appeal from the United States District Court
for the Southern District of Mississippi

---

Before GARWOOD, JOLLY and SMITH, Circuit Judges.

GARWOOD, Circuit Judge:

Appellant Briggs's pro se complaint, filed June 29, 2001, alleged that Mississippi violated the Establishment Clause of the First Amendment by using public property and funds to fly the state flag in that the flag's union or canton square is the Confederate battle flag which displays "the St. Andrew's Cross (or Southern Cross), long regarded by many to reflect a particular religious heritage," and this was offensive to Briggs as he was "a Miracle Muslim." The only defendant mentioned in the complaint is the

State of Mississippi.  The relief requested was that "a just inquiry be made to determine whether a religious symbol, namely the St. Andrew's Cross, should be removed from display on public property" and that "the State of Mississippi . . . be made to compensate me by paying punitive damages not to exceed $77.77 million (US)."

The State moved to dismiss on the basis of the Eleventh Amendment and because the complaint did not state a constitutional violation.

On November 14, 2001, Briggs, through counsel, filed a response to the motion to dismiss.

On December 19, 2001, Briggs, through counsel, filed a motion for leave to amend the complaint.  The tendered amended complaint names as defendants only the State of Mississippi and "Ronnie Musgrove."  The *only* allegation concerning Musgrove is that he "is the governor for the State of Mississippi."  All other allegations are as to the state defendant, e.g., "Defendant, State of Mississippi, has willfully and maliciously used public property and public funds to display a religious symbol, namely, the St. Andrew's (or Southern Cross), long regarded by many to reflect a particular religious heritage."  The amended complaint alleges that "the display of the St. Andrew's Cross in the canton of the Mississippi State flag is a violation of his [plaintiff's] Constitutional rights."  The relief sought is "a declaratory judgment mandating that the religious symbol, namely the St.

2

Andrew's Cross, be removed from display in public places," "a declaratory judgment mandating that the Defendant, State of Mississippi, found to be in violation of the First Amendment," "compensatory damages in the amount not to exceed 77.77 Million Dollars," and reasonable attorney fees and costs.

On August 12, 2002, the district court entered its memorandum opinion and final judgment, granting the State's motion to dismiss, denying Briggs's motion for leave to amend, and dismissing the case.

## Discussion

Briggs appeals, raising three issues.

*Eleventh Amendment*

Briggs first argues that the district court erred in determining that the Eleventh Amendment barred him from seeking damages and equitable relief against Mississippi. We reject that contention. *Pennhurst State School & Hospital v. Halderman*, 104 S.Ct. 900, 908-09 (1984). As we said in *Voisin's Oyster House, Inc. v. Guidry*, 799 F.2d 183 (5th Cir. 1986), the Eleventh Amendment bars suit against a state or "state entity, as opposed to a state official, regardless of whether money damages or injunctive relief is sought" and section 1983 does not override the Eleventh Amendment.

*Establishment Clause*

Second, Briggs argues that the district court erred in holding

that Mississippi's use of the St. Andrew's Cross on the state flag does not constitute a violation of the Establishment Clause.

The Mississippi state flag indisputably has the Confederate battle flag as its union or canton corner or square. *See, e.g., Mississippi Division of United Sons v. Ms. NAACP*, 774 So.2d 388, 390 (Miss. 2000) ("While the State Flag is not simply a Confederate Battle Flag, the part of the State Flag found objectionable by the NAACP and others is the depiction of such Confederate flag in the State Flag's canton corner"). The flag was adopted in 1894, when the Mississippi legislature approved the committee report which

> ". . . recommend for the flag one with width two-thirds of its length; *with the union square , in width two-thirds of the width of the flag; the ground of the union to be red and broad blue saltier[1] thereon, bordered with white and emblazoned with thirteen (13) [mullets][2] or five-pointed stars, corresponding with the number of the original States of the Union;* the field to be divided into three bars of equal width, the upper one blue, the center one white and the lower one, extending the whole length of the flag, red-the national colors; the staff surmounted with a spear head and a battle-axe below; the flag to be fringed with gold and the staff gilded with gold." *Id*. at 391 (emphasis added).

However, in 1906 that 1894 legislation adopting the flag was

---

[1]Webster's Third New International Dictionary (1981 Ed.) states that "saltier" is the archaic of "saltire" (*id*. at 2005). It defines the adjective "saltire" as "shaped like an X". *Id*. For the noun "saltire" the first two meanings given are: ". . . **1 *heraldry*: an ordinary consisting of a cross formed by a bend dexter and a bend sinister crossing in the center of the field 2: an X-shaped cross; *esp*: Saint Andrew's Cross . . ."** *Id.*

[2]*See Daniels v. Harrison County Bd. of Supervisors*, 722 So.2d 136, 139 n.1 (Miss. 1998) (Banks, J., concurring).

(apparently inadvertently) repealed by the general repeal of all laws not included in the then enacted codification. *Id.* Nevertheless the 1894 flag continued to be flown as the state flag of Mississippi "by custom and usage." *Id*. at 391-92.

As reflected by, *inter alia*, the decisions in *Mississippi Div. of United Sons* and *Daniels v. Harrison County Bd. of Supervisors*, 722 So.2d 136 (Miss. 1998), the flying of the Confederate Battle Flag (alone or as incorporated in the canton square of what was assumed to be the official state flag) aroused heated controversy between those for whom it "commemorate[d] the sacrifice made in support of the cause of the Confederacy" and those for whom it was an offensive "symbol of white supremacy" or oppression. *Daniels* at 139 (Banks, J., concurring); *see also id*. at 141. Following the decision in *Mississippi Div. of United Sons* that there was no official state flag, the controversy became more active and public. In January 2001 the Mississippi Legislature enacted legislation providing that the state flag would be determined by an election to be held April 17, 2001, at which the voters would choose between two described flags, one being the identical 1894 flag and the other being a flag similar in all respects to that of 1894 except for its canton corner which would consist entirely of a blue ground (white bordered on its bottom and fly sides) with a circle of thirteen stars containing an inner circle of six stars with one

5

large star in its middle.[3]  The voters chose the 1894 flag.[4]

While nothing in the 1894 legislation or the 2001 legislation, and nothing in their legislative histories of which we are aware, nor anything in any of the cited decisions of the Mississippi courts, refers to the St. Andrew's Cross, we recognize that the Confederate Battle Flag has frequently been described as containing a St. Andrew's Cross.  *See, e.g., Coleman v. Miller*, 885 F.Supp. 1561, 1564 (N.D. Ga. 1995) ("During the Civil War, the Confederacy adopted a square battle flag depicting a blue St. Andrew's Cross on a red field;" with picture of flag).  We also recognize that St. Andrew is a religious figure, he, along with his brother Peter, being one of the twelve apostles of Christ and whose Christian ministry is recounted in the New Testament.  The connection between the emblem on the Confederate Battle flag and St. Andrew is, however, another matter.  Material attached to Briggs's complaint

---

[3]2001 General Laws of Mississippi, Ch. 301.

[4]As a result, and as provided in the legislation, § 3-3-16 of the Mississippi Code was enacted to read:

"The official flag of the State of Mississippi shall have the following design: with width two-thirds (2/3) of its length; with the union (canton) to be square, in width two-thirds (2/3) of the width of the flag; the ground of the union to be red and a broad blue saltire thereon, bordered with white and emblazoned with thirteen (13) mullets or five-pointed stars, corresponding with the number of the original States of the Union; the field to be divided into three (3) bars of equal width, the upper one blue, the center one white, and the lower one, extending the whole length of the flag, red (the national colors); this being the flag adopted by the Mississippi Legislature in the 1894 Special Session."

states the following (none of which we dispute):

> "*The letter '**X**' when positioned on its side is commonly known as the Cross of St. Andrew* and dates back to early Christian history.
> As recorded in the Holy Scriptures, Andrew was born in the city of Bethsaida on the north shore of Galilee (John 1:44), but lived in nearby Capernaum (Mark 1:21, 29). He worked with his brother Simon Peter as a fisherman. . . . Later on, Jesus called both Andrew and his brother Simon Peter to leave their fishing business and become His disciples (Mark 1:16-18). Andrew became one of the twelve apostles of our Lord and was active in the establishment of the early Christian Church in Palestine (Acts 1:13).
> *Tradition says* that Andrew was responsible for spreading the Christian Faith throughout Asia Minor and Greece. For his fervent preaching and testimony of Jesus Christ, he was put to death by the Romans when he was around 85 years old in AD 69 in the city of Patras, Greece by being pinned to a cross. *At his own request, the cross was turned on its side because he felt he was not worthy to be crucified like his Lord*. . . . Legend says that either a Greek monk or an Irish assistant of St. Columba called St. Rule was warned in a dream to remove the remains of St. Andrew to the 'ends of the earth' for safekeeping. This he did and was shipwrecked on the east coast of Scotland at the location which is now known as St. Andrews.
> Another legend says that Acca, the Bishop of Hexham, a collector of relics brought the bones of St. Andrew to an existing religious center at St. Andrews, Scotland in AD 733. This became Scotland's first association with St. Andrew. After the battle with the Northumbrians of England in AD 832, the Scots adopted him as their patron Saint and the saltire as the symbol for their national flag. For hundreds of years, brave Scottish warriors have fought under this noble banner.
> This same symbol is also known as **Jacob's Cross**. It represents the blessing of the patriarch Jacob/Israel when he crossed his arms and blessed the two sons of Joseph (Genesis 48:8-22).
> Around 600 BC, the Greeks designated '**X**' **as the letter 'chi' in their alphabet which in New Testament times came to represent** *Christ*. Therefore, the letter **X**, when used alone or in combination with other letters, often stands for the word **Christ**, as in **Xmas**." (italics added).

7

We are unable to accept, however, that every X, or every X the straight-line connection of whose four points would form a square, is predominately a religious symbol.[5]

We have noted three different tests used to determine whether governmental action violates the Establishment Clause. *See Freiler v. Tangipahoa Parish Bd.*, 185 F.3d 337, 343 (5th Cir. 1999).

One of these tests is "the coercion test" which "analyzes school-sponsored religious activity in terms of the coercive effect that the activity has on students." *Id*. That test is facially inapplicable here. Moreover, the mere display on public property of the state flag, or the use of public funds for that purpose, is in no meaningful sense either a religious activity or coercive. *See, e.g., Coleman v. Miller*, 117 F.3d 527 (11th Cir. 1997) (Georgia state flag incorporating the Confederate Battle flag); *N.A.A.C.P. v. Hunt*, 891 F.2d 1555 (11th Cir. 1990) (Confederate flag flown on Alabama capitol dome); *Mississippi Div. of United Sons; Daniels. See also, e.g.*, *Murray v. City of Austin*, 947 F.2d 147 (5th Cir. 1991).

The tests more relevant here are those of *Lemon v. Kurtzman*,

---

[5]Moreover, nothing in the religious aspect of the St. Andrew's Cross consists of anything other than a cross on its side. Neither color nor the presence of stars is a part of that. The Scottish flag, for example, is a rectangle with a blue field on which is an unadorned white cross whose points end at each of the rectangle's corners. The Confederate Battle flag is a square, with a red field on which is set a white bordered blue cross reaching each corner of the square and containing 13 white stars.

8

91 S.Ct. 2105 (1971), and the "endorsement test." *Freiler* at 343. Under the former, "a state practice is unconstitutional if (1) it lacks a secular purpose; (2) its primary effect either advances or inhibits religion; or (3) it excessively entangles government with religion." *Id*. "[T]he endorsement" test "seeks to determine whether the government endorses religion by means of the challenged action." *Id*.

Plainly, *Lemon's* first prong is fully satisfied here. To the extent that a religious symbol–the St. Andrew's Cross–is displayed, it is displayed only insofar as it is included within the Confederate Battle flag which forms the union or canton corner of the Mississippi state flag. It is obvious–and Briggs does not allege otherwise–that at least *a* purpose of having the Confederate Battle flag as the canton corner of the Mississippi state flag is and was secular.[6] As stated in *Hunt*, "[i]t is clear that whether the [Confederate] flag was hoisted to decry integration or the recognize history, the purpose of its hoisting was secular." *Id*. at 1564. It is similarly clear that *Lemon's* third prong–that the challenged action not excessively entangle government with religion–is likewise satisfied here. As reflected by materials attached to Briggs's complaint, the State of Mississippi did not

---

[6]"*Lemon's* first prong does not require that challenged state action have been enacted in furtherance of exclusively, or even predominately, secular objectives." *Freiler* at 344. *See also, e.g., Lynch v. Donnelly*, 104 S.Ct. 1355, 1362-63 & n.6 (1984).

design the Confederate Battle flag.  In 1894 (and again in 2001, when the State, in essence, declined to change the flag it had consistently flown for over a century), Mississippi merely prescribed as the canton corner of the State flag the identical design which had been created by Confederate generals Beauregard and Joseph E. Johnson in 1861, and thereafter had been used by Confederate forces throughout the Civil War and became well known at least throughout the South.  These one time, isolated decisions, and the flying of the state flag pursuant thereto, do not comprehend, require or lead to any involvement by the government with any religious institution or group or any interaction between the government and any such institution or group.

We turn now to the second prong of the *Lemon* test and to the related endorsement test.  We have suggested that these tests are similar.  *Freiler* at 346.  As the Eleventh Circuit stated in respect to Alabama's flying of the Confederate flag "[ i]t is also clear that the primary effect of the flag is not to promote religion; rather it is to remind citizens, albeit offensively to some, of a controversial era in American history."  *Hunt* at 1564. It is common knowledge that public reaction to and the debate over the flying of the Confederate Battle flag, or its being a part of a state flag, has been virtually exclusively in relation to its symbolism of the Confederacy and the valor of its troops and whether or to what extent this symbolism extols or excuses slavery,

10

racial oppression or resistance to racial equality. None of this concerns any religious symbolism related to any presence of the St. Andrew's Cross in the flag.[7] Neither the endorsement test nor the second prong of *Lemon* is violated where any endorsement of or benefit to religion by the challenged governmental action is merely "indirect, remote, or incidental." *Lynch v. Donnelly* 104 S.Ct. 1355, 1364 (1984) (internal quotation marks omitted). In making this determination we focus on the display as an entirety, and on its contextual history, not merely on the portion of the display claimed to constitute a religious symbol. *Lynch* at 1360-61, 1364; *Murray* at 154-55. Merely because "some observers may perceive that the" government "has aligned itself with the Christian faith by" the presence of a St. Andrew's Cross within the flag does not suffice to make out a *Lemon* or endorsement test violation. *Lynch* at 1364; *Capitol Square Review And Advisory Bd. v. Pinette*, 115 S.Ct. 2440, 2455 (1995) (O'Connor, J., concurring) (rejecting view that "a religious display is necessarily precluded so long as some

---

[7]*See, e.g., Coleman v. Miller*, 885 F. Supp. 1561, 1569 (N.D. Ga. 1995) (concerning the Georgia state flag, adopted in 1956 to include the Confederate Battle flag, "[t]o some, it represents the undeniable fact that Georgia was a member of the Confederacy and did secede from the Union. The flag may also represent southern heritage, the old South, or values of independence. Undeniably, to others it represents white supremacy, rebellion, and discrimination"); *Coleman v. Miller*, 912 F. Supp. 522, 530 (N.D. Ga. 1996), *aff'd*, 117 F.3d 527, 530 (11th Cir. 1997) ("the Georgia flag conveys mixed meanings: to some it honors those who fought in the Civil War and to others it flies as a symbol of [racial] oppression"); *Daniels* at 139-40 (Banks, J., concurring); *Mississippi Div. of United Sons* at 390.

11

passerby would perceive a governmental endorsement" of religion).

As Justice O'Connor explained in *Capitol Square*:

> ". . . the endorsement test creates a more collective standard to gauge 'the "objective" meaning of the [government's] statement in the community,' *Lynch*, *supra*, at 690, 104 S.Ct., at 1368 (O'CONNOR, J., concurring). In this respect, the applicable observer is similar to the 'reasonable person' in tort law, who 'is not to be identified with any ordinary individual, who might occasionally do unreasonable things,' but is 'rather a personification of a community ideal of reasonable behavior, determined by the [collective] social judgment.' W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts 175 (5th ed. 1984). Thus, 'we do not ask whether there is *any* person who could find an endorsement of religion, whether *some* people may be offended by the display, or whether *some* reasonable person *might* think [the State] endorses religion.' *Americans United*, 980 F.2d at 1544. . . . There is always *someone* who, with a particular quantum of knowledge, reasonably might perceive a particular action as an endorsement of religion. A State has not made religion relevant to standing in the political community simply because a particular viewer of a display might feel uncomfortable.
> It is for this reason that the reasonable observer in the endorsement inquiry must be deemed aware of the history and context of the community and forum in which the religious display appears. . . . Nor can the knowledge attributed to the reasonable observer be limited to the information gleaned simply from viewing the challenged display." *Id*. at 2455 (O'Connor, J., concurring).

It is clear to us that, as a matter of law, despite what Briggs himself or some others might perceive, the objective meaning in the community of Mississippi's display of its flag is not the State's endorsement of religion or any particular religion, and that any endorsement of or benefit to religion from that display is at most indirect, remote and incidental. The flag fails neither

12

the second prong of *Lemon* nor the endorsement test.

We have held that governmental display of symbols which were more obviously and directly religious did not violate the Establishment Clause. In *Murray* we sustained summary judgment dismissal of an Establishment Clause claim predicated on Austin's official insignia (displayed on its vehicles, letterhead, uniforms and some of its buildings) containing the coat of arms of its founder, Stephen F. Austin, which included the Christian cross used only by the Roman Catholic denomination and which is in a far more unique form than the objected to X form within the Confederate Battle flag. *See id.* at 150, 159.[8] *See also, e.g., O'Hair v. Blumental*, 588 F.2d 1144 (5th Cir. 1979), in which we affirmed, on the basis of the district court's opinion, *O'Hair v. Blumenthal*, 462 F. Supp. 19 (W.D. Tex. 1978), the grant of a motion to dismiss

---

[8]In rejecting the Establishment Clause claim in *Murray* we stated:
> ". . . in considering the Establishment Clause challenge to Austin's insignia, we must recognize the reason for the cross originally being in the coat of arms; that Austin did not have an improper purpose in adopting the insignia; its long and unchallenged use; its non-proselytizing effect; that in its context, it does not endorse religion in any true or meaningful sense of the word "endorsement"; and that requiring the City to remove all displays of the insignia, arguably evinces not neutrality, but instead hostility, to religion." *Id.* at 158.

All these factors are present here in favor of Mississippi, and indeed the here challenged symbol, to the extent that it is religious, is certainly less overtly and obviously so than the Christian cross in *Murray*. *See id.* at 149, 150, 159.

13

for failure to state a claim of a suit raising an Establishment Clause challenge to our national motto "In God We Trust" and its appearance on our coins. The same holding was made by the Tenth Circuit in *Gaylor v. United States*, 74 F.3d 214 (10th Cir. 1996).

We hold that the Mississippi flag does not violate the Establishment Clause.

*Leave to Amend*

Finally, Briggs asserts that the district court abused its discretion in denying his motion for leave to amend his complaint. The district court did not abuse its discretion because, for the reasons above stated, the proposed amended complaint could not survive a FED. R. CIV. P. 12(b)(6) motion and allowing Briggs to amend the complaint would be futile. *See Lewis v. Fresne*, 252 F.2d 352, 360 n.7 (5th Cir. 2001).[9]

AFFIRMED.

---

[9]We also note that the proposed amended complaint insofar as it named the State of Mississippi as a defendant was still subject to dismissal under the Eleventh Amendment. Insofar as the proposed amended complaint named Governor Musgrove it fails to allege action (or inaction) on his part or any relationship he has or had to the flying of the flag.

14