## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-30707

United States Court of Appeals
Fifth Circuit

**FILED**

July 10, 2019

Lyle W. Cayce
Clerk

CALDWELL WHOLESALE COMPANY, L.L.C.,

  Plaintiff - Appellant

v.

R J REYNOLDS TOBACCO COMPANY,

  Defendant - Appellee

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 5:17-CV-200

Before CLEMENT, GRAVES, and OLDHAM, Circuit Judges.

PER CURIAM:*

  Plaintiff-Appellant Caldwell Wholesale Company, L.L.C. ("Caldwell") seeks reversal of the district court's dismissal of its Louisiana Unfair Trade Practices Act ("LUTPA") and tortious interference claims against Defendant-Appellee R.J. Reynolds Tobacco Company ("RJR"). Because the district court correctly ruled that Caldwell's claims are time-barred, we affirm.

---

 * Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 18-30707

# I

## A

Caldwell is a wholesale distributor servicing retail customers in the cigarette market. RJR supplies cigarettes and other tobacco products to retailers through wholesale distributors. Some distributors buy their products directly from RJR, while others purchase from other wholesalers. Every retailer purchases RJR products from either a direct wholesaler or an indirect wholesaler.

RJR incentivizes retailers to purchase RJR products from direct distributors, which allows retailers to receive discount benefits through "buydown" payments from RJR, based on their purchase of RJR products. Some retailers who purchase RJR products from indirect wholesalers can also receive the benefits of the buydown program if the indirect wholesaler has entered a so-called "sub-jobber" agreement with RJR. Purchases made from indirect wholesalers who have not entered a sub-jobber agreement with RJR are not recognized for buydown purposes.

The buydowns are manufacturer rebates. RJR manufactures a carton of cigarettes and sells that carton to a direct-distributor wholesaler at a given price. The wholesaler then sells that carton to a retailer at a marked-up price, to earn a profit. The retailer then sells that carton to customers, presumably at a higher price than the mark-up.

If the retailer independently contracts with RJR, the retailer can receive a buydown payment from RJR after purchasing from a wholesaler that is eligible for the RJR buydown system. If RJR offers a buydown payment, the retailer can sell the carton of cigarettes for less than its purchase price from the wholesaler and still make a profit on the sale. The RJR buydown system allows the retailer to sell the carton of cigarettes to customers at a lower price. Contrarily, a retailer purchasing RJR products from a wholesaler that does not

No. 18-30707

qualify for the buydown system must sell its carton of cigarettes for a higher price to make a profit. Given the price sensitivity of the cigarette market, retailers who purchase RJR products generally avoid buying products from wholesalers who are ineligible for the buydown system.

Retail purchases of RJR products from wholesalers are reported to RJR by a third party, Management Science Associates, Inc. ("MSA"). MSA tracks tobacco sales by wholesalers nationwide and electronically reports the sales data. Later, RJR determines whether specific purchases by retailers qualify for the buydown system and issues buydown payments. The buydown payments are typically issued once every two weeks.

Caldwell is not a buydown-eligible wholesaler. Therefore, RJR does not issue buydown payments to retailers for products bought from Caldwell. Caldwell had been a direct distributor of RJR products for 45 years. However, in December 2004, RJR terminated its direct-distributor agreement with Caldwell—forcing Caldwell to buy RJR products from an intermediary. Caldwell contends, *inter alia*, that the contract was terminated in retaliation for Caldwell joining a 2003 federal lawsuit against RJR brought by twenty wholesalers. The wholesalers alleged that RJR was engaged in price discrimination and other antitrust violations. Caldwell asserts RJR incorrectly assumed that Caldwell's president played a role in organizing the litigation and encouraged other wholesalers to join the case. As a result, RJR began refusing to issue buydown payments to retailers who purchased RJR products from Caldwell. The practice has continued since Caldwell lost its direct distributor status in 2004, although RJR issues buydown payments for RJR products sold by other wholesalers who, like Caldwell, are not direct distributors with RJR.

Since RJR terminated its direct-distributor agreement with Caldwell, several events have taken place in the tobacco industry that have changed the

3

viability of Caldwell's business. In May 2006, RJR's parent company, Reynolds American, Inc., acquired Conwood, which manufactures Grizzly brand moist snuff. Grizzly was Caldwell's top-selling brand of moist snuff at that time. Following the Conwood acquisition, purchases of Conwood products— including Grizzly moist snuff—from Caldwell are no longer eligible for buydown payments. In February 2011, Caldwell approached RJR seeking to enter a sub-jobber agreement, which would have made retail purchases from Caldwell eligible for the buydown system again. After some deliberation— which included Caldwell allowing RJR access to its proprietary sales information—RJR denied Caldwell's request. RJR determined that the distribution of its products would not be improved by entering a sub-jobber agreement with Caldwell. In 2014, Caldwell again sought to enter a sub-jobber agreement with RJR. The request was denied by RJR. In 2015, Reynolds American, Inc. acquired Lorillard, Inc., the manufacturer of Newport cigarettes. Newport was Caldwell's second top-selling brand of cigarettes. Following the acquisition, purchases of Lorillard products from Caldwell— including Newport cigarettes—were no longer eligible for the buydown system.

The tobacco industry is highly competitive and price sensitive. One byproduct of the competition is that retailers like to purchase the products they sell from as few wholesalers as possible. Retailers who want to receive the benefits of RJR's buydown system must obtain RJR products from an eligible wholesaler. Caldwell alleges it is directly harmed by exclusion from the buydown system because its customers must either use multiple wholesalers to purchase RJR products or suffer lower profit margins. As a result, Caldwell has struggled to retain customers. Caldwell has lost all its business from some retailers and most of its business from others. Caldwell has also lost virtually all sales from two of its former top-selling products. In addition, Caldwell asserts that RJR's conduct has substantially impeded its ability to acquire new

No. 18-30707

customers. Caldwell alleges that RJR's conduct has continued since 2004 to the present.

**B**

On January 31, 2017, Caldwell filed a lawsuit against RJR in the United States District Court for the Western District of Louisiana. Caldwell brought two claims based on RJR's refusal to allow retailers that purchase RJR products from Caldwell to receive buydown reimbursements. First, Caldwell asserted a claim against RJR for tortious interference, arguing that RJR's refusal to "buydown" products for retailers purchasing from Caldwell serves no legitimate business interest and was done intentionally to harm Caldwell's business. Second, Caldwell alleged that RJR's conduct represents unfair trade practices under LUTPA. Caldwell seeks, *inter alia*, a permanent injunction enjoining RJR from refusing to issue buydown payments to retailers that purchase RJR products from Caldwell. Caldwell wants its buydown eligibility restored.

After Caldwell filed the complaint, the magistrate judge issued a memorandum and order indicating that Caldwell had failed to adequately plead its own citizenship to establish diversity jurisdiction and directed Caldwell to file an amended complaint addressing diversity jurisdiction. Caldwell filed its first amended complaint, alleging that the individuals who make up the ownership of Caldwell were residents of Louisiana, but said nothing about their domicile. The next day, the magistrate issued a second order *sua sponte*, noting that domicile, not residency, determines an individual's citizenship to establish diversity. The magistrate judge did not order Caldwell to fix the deficiency but chose to construe the allegations of Louisiana residency to be allegations that the individuals who own Caldwell are domiciled in Louisiana.

No. 18-30707

RJR moved to dismiss the complaint pursuant to Rule 12(b)(6), arguing, *inter alia*, that both of Caldwell's claims are timed-barred. The district court granted RJR's motion. This appeal followed.[1]

## II

"We review de novo a district court's grant of a Rule 12(b)(6) motion, 'accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiff.'" *Greene v. Greenwood Pub. Sch. Dist.*, 890 F.3d 240, 242 (5th Cir. 2018) (quoting *SGK Props., L.L.C. v. U.S. Bank Nat'l Ass'n*, 881 F.3d 933, 943 (5th Cir. 2018)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). However, neither conclusory allegations nor "unwarranted deductions of fact" prevent a motion to dismiss from being granted. *Id.* (quoting *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992)).[2]

---

[1] On appeal, this court directed the parties to provide briefing on the adequacy of diversity jurisdiction. Caldwell's opening brief did not address diversity jurisdiction. However, several weeks later, Caldwell moved to amend its complaint to address the diversity of citizenship issue and the amount in controversy. RJR did not oppose the motion. On October 16, 2018, this court granted Caldwell's motion. *See* 28 U.S.C. § 1653. The same day, Caldwell filed a second amended and restated complaint alleging that the individuals who make up the ownership of Caldwell are all Louisiana citizens domiciled in Caddo Parish. *Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1080 (5th Cir. 2008) ("[T]he citizenship of a[n] LLC is determined by the citizenship of all of its members."). RJR is a North Carolina corporation. Caldwell also seeks damages in excess of $75,000. Caldwell has pleaded facts sufficient to establish diversity jurisdiction under 28 U.S.C. § 1332. The district court properly exercised jurisdiction over this case.

[2] The district court concluded that Caldwell has standing to bring its LUTPA claim. However, because the LUTPA and tortious interference claims are time-barred, we reach no conclusion regarding the statutory standing issue. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 & n.4 (2014) (explaining that whether a plaintiff "falls within the class . . . authorized to sue" is not jurisdictional because it affects whether the plaintiff "has a cause of action under the statute," not the court's "*power* to adjudicate the case").

No. 18-30707

## III

### A

RJR's 12(b)(6) motion sought dismissal of Caldwell's claims as time-barred. *See Jones v. Alcoa, Inc.*, 339 F.3d 359, 366 (5th Cir. 2003) (noting that a statute of limitations defense may be properly asserted in a Rule 12(b)(6) motion where it is evident in the pleadings that the claim is time-barred). Based on the pleadings, Caldwell's claims are time-barred.

There is a one-year limitations period for a party to bring an action under LUTPA. *See* La. Stat. Ann. § 51:1409(E) (private right of action under LUTPA "shall be subject to a liberative prescription of one year running from the time of the transaction or act which gave rise to this right of action").[3] Under Louisiana law, "if prescription is evident on the face of the pleadings . . . the burden shifts to the plaintiff to establish that the applicable prescriptive period has been suspended or interrupted." *See, e.g.*, *Potier v. JBS Liberty Secs., Inc.*, No. 6:13-CV-00789, 2014 WL 5449726, at *3 (W.D. La. Oct. 24, 2014) (citing *Taranto v. La. Citizens Prop. Ins. Corp.*, 62 So.3d 721, 726 (La. 2011)). According to Caldwell, the act that initiated the alleged LUTPA harms occurred in December 2004, when RJR decided to terminate its direct-distributor agreement with Caldwell.[4] The termination ended Caldwell's buydown eligibility. This case was filed on January 31, 2017, more than eleven years past the one-year prescription period. Caldwell contends, however, that RJR's ongoing refusal to reinstate Caldwell's buydown eligibility—while

---

[3] The district court determined that the La. Stat. Ann. § 51:1409(E) filing period is preemptive based on prior conclusions reached by federal courts and state appellate courts. However, the Louisiana legislature later amended the statute, which now reads: "The action provided by this Section . . . shall be subject to a *liberative prescription* of one year . . . ." *Id.* (emphasis added). Based on the clear language of the statute, § 51:1409(E) is prescriptive in nature. Irrespective of this distinction, Caldwell's claims are time-barred.

[4] Caldwell contends that RJR's 2011 and 2014 rejections were not separate sources of the injuries alleged but were merely evidence of RJR's ongoing harmful conduct.

7

continuing to buydown the sales of Caldwell's competitors who are not direct-distributors—is a continuing tort.

The district court rejected Caldwell's argument that the continuing tort doctrine applies to this case. Caldwell argues that the district court improperly based its rejection of the continuing tort theory on a lack of direct communication or action between the parties. RJR argues that the continuing tort doctrine does not apply because Caldwell has not alleged continuous unlawful conduct.

Whether RJR's ongoing exclusion of Caldwell from the buydown system constitutes a continuing tort is partially "a conduct-based [inquiry, with the court] asking whether the tortfeasor perpetuates the injury through overt, persistent, and ongoing acts." *Young v. United States*, 727 F.3d 444, 448 (5th Cir. 2013) (alteration in original) (quoting *Hogg v. Chevron USA, Inc.*, 45 So.3d 991, 1003 (La. 2010)). "A continuing tort is occasioned by [ongoing] unlawful acts, not the continuation of the ill effects of an original, wrongful act." *Crump v. Sabine River Auth.*, 737 So.2d 720, 728 (La. 1999). "The continuous conduct contemplated in a continuing tort must be tortious and must be the operating cause of the injury." *Id.* at 729 n.7. Accordingly, "there must be a continuing duty owed to the plaintiff and a continuing breach of that duty by the defendant." *Id.* at 728.

Caldwell misconstrues the district court's analysis with respect to the allegations of continuing tortious conduct.[5] Caldwell asserts that RJR causes ongoing substantial financial harm to Caldwell by continuing to make buydown payments to retailers who purchase products from Caldwell's competitors while Caldwell remains ineligible for the buydown system.

---

[5] This court need not determine whether the continuing tort doctrine requires ongoing communication or action between the respective parties because that was not the basis of the district court's conclusion.

8

Significantly, Caldwell does not contend that the buydown payments are unlawful. To the contrary, Caldwell is seeking to participate in the buydown system, precisely so its retailers can receive the payments. As a result, the district court focused on the allegations of RJR's "ongoing refusal" to allow Caldwell to participate in the buydown system. The district court found three separate actions to be the only potentially tortious conduct alleged in the complaint: (1) the termination of the parties' direct-distributor agreement in 2004; (2) RJR's rejection of Caldwell's request for buydown eligibility in 2011; and (3) RJR's rejection of Caldwell's request for buydown eligibility in 2014. Because those three separate events are the only actions that evidence RJR's decision to make and keep Caldwell ineligible for the buydown system, the district court determined that the 2014 rejection was the last act that could have triggered Caldwell's LUTPA claim and correctly concluded the claim is time-barred.

On appeal, Caldwell makes a last-ditch effort by directing this court's attention to the buydown system, arguing that RJR's payments—made on an ongoing basis—are "commercial transactions" that cause competitive harm to Caldwell. In Caldwell's view, RJR continues to make buydown payments to retailers purchasing from Caldwell's competitors to intentionally keep Caldwell at a competitive disadvantage.

Caldwell has not provided allegations or caselaw to demonstrate that the buydown payments alone represent tortious or unlawful conduct under LUTPA. LUTPA proscribes "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. § 51:1405(A). "Louisiana courts determine what is a LUTPA violation on a case-by-case basis." *Quality Envtl. Processes, Inc. v. I.P. Petroleum Co.*, 144 So.3d 1011, 1025 (La. 2014) (quotation omitted).

No. 18-30707

The Louisiana Supreme Court has consistently held that the "range of prohibited practices under LUTPA is extremely narrow," as the statute prohibits "only fraud, misrepresentation, and similar conduct, and not mere negligence." *Id.* at 1025 (quoting *Cheramie*, 35 So.3d at 1060). Courts are hesitant to impose liability under LUTPA "where the evidence reveals merely a normal business relationship." *Omnitech Int'l, Inc. v. Clorox Co.*, 11 F.3d 1316, 1332 (5th Cir. 1994) (citing *Turner v. Purina Mills, Inc.*, 989 F.2d 1419, 1422 (5th Cir. 1993) ("[T]he statute does not provide an alternative remedy for simple breaches of contract.")). Moreover, "LUTPA does not prohibit sound business practices, the exercise of permissible business judgment, or appropriate free enterprise transactions." *Turner*, 989 F.2d at 1422. "Businesses in Louisiana are still free to pursue profit, even at the expense of competitors, so long as the means used are not egregious." *Id.* Even "conduct that offends established public policy and is unethical is not necessarily a violation under LUTPA." *Quality Envtl. Processes*, 144 So.3d at 1025.

Beyond the fact that Caldwell is explicitly seeking to regain inclusion in the buydown system, Caldwell has not suggested that any aspect of the buydown system is fraudulent, involves a misrepresentation, or violates any contractual or other obligation between the parties. Caldwell argues that the buydown system is anticompetitive—and therefore, unlawful—but only because RJR has refused Caldwell's requests for reentry into the system.[6] That theory falls well short of the tortious conduct that has been found to support LUTPA allegations. The continuing-tort LUTPA cases on which Caldwell relies illustrate the deficiency of its theory.

---

[6] Caldwell's alleged anticompetitive harms include various conclusory statements unsupported by the allegations, such as Caldwell's assertion that it would gain prospective customers if RJR made Caldwell buydown-eligible, or its claims that to keep Caldwell in a compromised state RJR must continue to deny buydown payments to retailers purchasing from Caldwell.

No. 18-30707

Caldwell first references *Tubos*, 292 F.3d 471, a case that involved a commercial dispute stemming from the lease of industrial testing equipment by the plaintiff—TAMSA, from the defendant—American. American brought counterclaims against TAMSA, including a LUTPA claim, alleging that TAMSA engaged in continuous conduct that violated the terms of the lease during the life of the agreement. *Id.* at 481. This court found that "[d]uring the entire term of the . . . lease, TAMSA was under a statutory duty to perform its obligations under the lease in good faith." *Id.* at 482 (citing La. Civ. Code Ann. art. 1983 ("Contracts must be performed in good faith.")). In addition, the "deceptive and unethical undertones of TAMSA's alleged behavior during the 1997 lease period"—which included preparing to violate the terms of the lease at the time the parties made the agreement and deceiving American about its intentions—supported the allegations of a continuing tort under LUTPA. *Tubos*, 292 F.3d at 482.

Next, Caldwell highlights *Bihm v. Deca Sys., Inc.*, 226 So.3d 466 (La. Ct. App. 2017), which involved a dispute between former business partners turned competitors. Like *Tubos*, the defendants countersued the plaintiffs for alleged violations of LUTPA and tortious interference under a continuing tort theory. This court determined that the plaintiffs had a "duty to refrain from *acquiring or misappropriating* the *trade secret information* . . . and to refrain from disclosing such trade secret information to other persons." *Id.* at 489 (emphases added). The *Bihm* court added, "under LUTPA, the Bihm parties had the duty to refrain from engaging in unfair methods of competition and unfair or deceptive acts or practices . . . . Each and every time the Bihm parties used the data and other trade secret information . . . to conduct business . . . constituted a separate breach of that duty." *Id.* The alleged conduct was a continuing tort under LUTPA because the plaintiffs had continued their unlawful actions through the date the lawsuit was filed.

11

Unlike *Tubos* and *Bihm*, there are no allegations of fraud, misrepresentation, or deceit associated with the buydown system. Moreover, the only alleged "unfair" conduct connected to the buydown system is RJR's refusal to make Caldwell eligible for the system. The refusal is the operating cause of Caldwell's alleged harms, not the system.[7] Therefore, the district court was correct in focusing on the instances when RJR denied Caldwell buydown eligibility.

Irrespective of whether the decision to terminate Caldwell's direct-distributor status can establish a LUTPA violation, the decision was not continuous conduct under Louisiana law. As this court stated in *Young*, "it is clear that both the injury *and* the wrongful conduct that caused it must be continuous" to allege a LUTPA claim. 727 F.3d at 448 (emphasis in original). Caldwell sufficiently alleges that it suffers ongoing injuries from being ineligible for the buydown program. However, Caldwell also argues that its injuries stem from the decision to terminate its direct-distributor agreement in 2004. Notably, Caldwell contends that the 2011 and 2014 rejections should not be understood as the source of any injury alleged in the complaint.

In *Crump*, the Louisiana Supreme Court made it clear that "[a] continuing tort is occasioned by unlawful acts, not the continuation of the ill effects of an original, wrongful act." 737 So.2d at 728. If the operating cause of the injury is not the result of continuous conduct, "prescription runs from the date that knowledge of such damage was apparent or should have been apparent to the injured party." *Id.* at 726. Caldwell became ineligible for the buydown system through one action: RJR's decision to terminate its direct-distributor agreement with Caldwell in December 2004. The resulting harms

---

[7] *See Miller v. Conagra, Inc.*, 991 So.2d 445, 456 (La. 2008) (rejecting assertion that failure to terminate a contract was a continuing violation of LUTPA where the failure to terminate appeared to be ancillary to the injurious act).

Caldwell has suffered are the byproducts of that act. Louisiana law is clear that such circumstances do not form the basis of a continuing tort.[8] The continuing tort doctrine does not apply to this case. Accordingly, the LUTPA claim is time-barred because Caldwell waited more than eleven years to file its lawsuit.[9] The district court properly dismissed Caldwell's LUTPA claim.

## B

The district court also dismissed Caldwell's tortious interference claim as time-barred. Caldwell's tortious interference claim is premised on the same conduct as its LUTPA claim. On appeal, Caldwell argues that "there is no distinction, for purposes of the continuing tort doctrine, between Caldwell's LUTPA and tortious interference with business claims." Under Louisiana law, a cause of action for tortious interference with business is delictual, and therefore subject to a prescriptive period of one year. *See* La. Civ. Code Ann. art. 3492 ("Delictual actions are subject to a liberative prescription of one year. This prescription commences to run from the day injury or damage is sustained."). To the extent Caldwell's tortious interference claim is based on RJR's refusal to reinstate Caldwell's buydown system eligibility, the same continuing tort analysis applied to the LUTPA claim controls. The claim is time-barred.

---

[8] *See Young,* 727 F.3d at 449 (rejecting the argument that federal maintenance of a highway could be consider continuing wrongful conduct by the government authority when its alleged actions causing the ongoing harm ended forty years prior); *Hogg*, 45 So.3d at 1007 (citing *Crump*, 737 So.2d at 729) (rejecting plaintiffs' contention that the failure to contain or remediate leakage constituted continuing wrong and citing *Crump* for the proposition that "the breach of a duty to right an initial wrong simply cannot be a continuing wrong that suspends the running of prescription, as that is the purpose of every lawsuit and the obligation of every tortfeasor").

[9] We need not address Caldwell's contention that the district court improperly dismissed his LUTPA claim based on conduct occurring since 2016. The operating cause of Caldwell's injuries was RJR's decision in 2004 to make Caldwell ineligible for the buydown system. Caldwell has neither alleged nor argued that any subsequent action by RJR rendered Caldwell ineligible for the buydown system. As stated previously, Caldwell's assertions regarding the buydown system alone do not support a LUTPA claim.

No. 18-30707

To the extent Caldwell contends that its tortious interference claim is based on RJR's buydown system alone, the claim is substantively deficient. Louisiana courts recognize a cause of action for tortious interference with a business relationship. *Bogues v. La. Energy Consultants, Inc.*, 71 So.3d 1128, 1134 (La. Ct. App. 2011). However, such claims are viewed with disfavor. *See St. Landry Homestead Fed. Sav. Bank v. Vidrine*, 118 So.3d 470, 490 (La. Ct. App. 2013), *writ denied*, 126 So.3d 1283 (La. 2013) (citing *Bogues*, 71 So.3d at 1135). While Louisiana law protects businesses from "malicious and wanton interference," when bringing a tortious interference claim, "it is not enough to allege that a defendant's actions affected plaintiff's business interests; the plaintiff must allege that the defendant actually prevented the plaintiff from dealing with a third party." *Bogues*, 71 So.3d at 1134–35. Caldwell merely alleges that the "consequence of RJR's conduct is to *deter* Caldwell's existing customers, as well as potential future customers, from doing business with Caldwell . . . ." (emphasis added). Caldwell has not alleged any facts that indicate RJR prevented, or attempted to prevent, Caldwell's prior, current, or prospective retail customers from purchasing from Caldwell. The district court properly dismissed Caldwell's tortious interference claim.

## C

Finally, Caldwell contends that the district court erred when it dismissed the claims with prejudice without granting Caldwell leave to amend its complaint. Caldwell argues that the court should have allowed it to provide more factual details in the complaint. Caldwell did amend its complaint once in the district court to address diversity jurisdiction but did not attempt to add factual details to support its claims. In addition, Caldwell's claims are either time-barred or substantively deficient. Therefore, it would have been futile to grant Caldwell leave to add more details to the complaint.

14

A district court's denial of leave to amend and the subsequent dismissal with prejudice are reviewed for an abuse of discretion. *See Rio Grande Royalty Co. v. Energy Transfer Partners, L.P.*, 620 F.3d 465, 468 (5th Cir. 2010) (citing *Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer*, 90 F.3d 118, 124 (5th Cir. 1996)) ("A district court's denial of a motion for leave to amend a pleading is subject to review for abuse of discretion."); *Porter v. Beaumont Enter. & Journal*, 743 F.2d 269, 271 (5th Cir. 1984) (limiting its review "to a determination of whether the district court abused its discretion"). A district court does not abuse its discretion by dismissing a complaint with prejudice where amendment would be futile. *Rio Grande Royalty*, 620 F.3d at 468 (citing *Briggs v. Mississippi*, 331 F.3d 499, 508 (5th Cir. 2003)) ("The trial court acts within its discretion in denying leave to amend where the proposed amendment would be futile because it could not survive a motion to dismiss."). The district court did not abuse its discretion.

## IV

For the reasons stated above, the district court is AFFIRMED.

15