PETTIGREW, J.
| sThe plaintiffs/defendants-in-reconvention, Timmy Bihm (T. Bihm), Shelly Bihm (S. Bihm), and Bihm Calibration Services, L.L.P. (BCS)(sometimes referred to collectively as the “Bihm parties”) appeal a July 15, 2015 judgment granted in favor of the defendants/plaintiffs-in-reconvention, Deca Systems, Inc. (Deca) and Gerald Callaway (Callaway)(sometimes also referred to as “defendants”), ordering the Bihm parties to pay defendants $83,041.16 for conversion/misappropriation of Deca funds.[2] The judgment also awarded defendants $739,319,00 as a base amount in damages for the Bihm parties’ violation of the Louisiana Unfair Trade Practices and Consumer Protection Law, La. R.S. 51:1401 et seq., (LUTPA), and the Louisiana Uniform Trade Secrets Act, La. R.S. 51:1431 et seq., (LUTSA), and for intentional interference with business relations. The district court increased the base amount to $2,217,957.00, in accordance with La. R.S. 51:1409(A), which mandates an award of treble damages if the unfair or deceptive act(s) were “knowingly used” after being put on notice by the attorney general to cease such acts. The total monetary award to Deca and Callaway was $2,300,998.16. The judgment also ordered T. Bihm to return to Callaway the Deca stock that previously had been donated to him by Callaway, as well as any dividends (as “fruits” of the donated stock—see La. C.C. art. 1566) that Deca had paid to T. Bihm. The judgment further ordered the Bihm parties to pay Deca and Callaway attorney fees in an amount “to be determined, if not agreed upon by the parties, at a subsequent Rule for Costs,” together with legal interest from the date of judicial demand, and all costs. Deca and Callaway answered the appeal, asking this court to increase the damages awarded to them for the Bihm parties’ violation of LUTPA, LUT-SA, and intentional interference with business relations and all ^attorney fees and costs of this proceeding. After a,thorough review, we amend in part, affirm as amended, and deny the answer to the appeal.
FACTUAL BACKGROUND
Callaway incorporated Deca in 1982. Deca is a closely held domestic corporation engaged in the business of calibrating and certifying industrial instrumentation, as well as repairing, renting, and selling industrial instrumentation. By all accounts, Deca was/is a successful and reputable business. Initially, Callaway had a business partner who had expressed an interest in investing in the company, but never became actively involved. This partner ultimately separated from Deca and returned his stock to Callaway. According to Calla-way, he began looking for qualified and loyal employee(s) whom he could make equity owners of Deca with the anticipation that this person(s) would assure the continuity of Deca’s business at his death or retirement.
Callaway hired T. Bihm, who ended up working at Deca for over twenty years, as a buyer in October 1990. At the time of hire, T. Bihm was twenty-two years old and newly wed to S. Bihm who, in 1996, *472 also began working at Deca as a bookkeeper. T. Bihm worked as a buyer of instruments for D.eca to repair for approximately two.years, but over the years, eventually moved through various positions within Deca, learning the trade of instrument calibration, renting, selling, and repairing instrumentation. Ultimately, he became general manager of the business and vice president of the company. According to T. Bihm, he “ran the company for many years.” T. Bihm worked at Deca from his date of hire in 1990 until November 30, 2010; his last day in the office was November 22, 2010.
In 1998, approximately eight years after hiring T. Bihm, Callaway transferred 24 shares of common stock of Deca to him. Again, in 2008, Callaway executed a transfer of shares whereby T. Bihm received an additional 12 shares of Deca stock, result? ing in T. Bihm owning a total.of 36 shares of Deca stock. Callaway characterized the transfers as “gifts”; T. Bihm asserts that he paid “blood, sweat, and tears” for the stock, claiming he worked tirelessly over the years to grow. Deca’s business. According to T. Bihm, he was instrumental in taking the company into the computer age of technology and he worked^ long hours and weekends to develop, expand, and enhance Deca’s database applications, following the initial installation and customization of such software by computer programmer, Jim Morrison, in 1995. This software allowed Deca to input and compile customer data and produce custom reports based on the compiled historical client and instrument information. The earlier service events database also’ provided, in a systematic and customized manner, information regarding client, vendor, and proprietary pricing information, formulas, patterns, compilations of information, methods, techniques, and processes for calibration of instruments, historical data on repairs, parts sold, rentals, and also allowed Deca to track the dates and intervals of its customers’ instruments in order to regularly solicit business and perform required instrument certifications.
According to Callaway, he envisioned the “unique” and “proprietary” design of Deca’s software, and he- directed Jim Morrison in its development at that time. In his capacity as general manager, T. Bihm had full access to the computer applications written by Jim' Morrison, the company’s later-acquired Péachtree financial systems, and calibration formulas and procedures. Over the years, following the installation and customization of Deca’s Software and databases, T. -Bihm became proficient in the use of the software for running Deca’s business and for calibration certification. "
T. Bihm’s wife, S. Bihm,. was hired in 1996 to do data entry. Callaway trained her in the basics of accounting, particularly, how to use Deca’s accounting software. Eventually, S. Bihm became Deca’s bookkeeper, a position of higher confidence and trust because she had full access to Deca’s funds, was in, charge of payroll and accounts receivables, and was .also responsible for reconciling and overseeing the use of Deca’s credit cards.. ,S. Bihm worked at Deca until she left the company on July 22, 2010, when Callaway raised questions and concerns regarding a pay raise T. Bihm gave S. Bihm without. Callaway’s knowledge or consent.
After S. Bihm’s departure from Deca, Callaway hired Theresa Cockerham as the replacement bookkeeper. Ms. Cockerham discovered questionable credit card purchases that appeared to have been made by each1 of the Bihms for personal non-Deca related expenses and for which no receipts were found, It was further, discovered that S. Bihmlfi often used a signature stamp to provide Callaway’s signature on *473 checks that she wrote, not. all of which were accounted for in Deca’s business. Apparently, based on the appearance of impropriety raised by the Bihms’ actions, as reflected by Ms. Cockerham’s findings, Callaway met with his attorney and prepared documents amending Deca’s articles of incorporation and removing the cumulative voting rights provisions to require a 51 percent vote of outstanding shares of stock (which only Callaway had) to seek involuntary dissolution, and removing T. Bihm as an officer and a member of Deca’s board of directors. The new documents were dated November 2, 2010. Shortly thereafter, T. Bihm’s employment with Deca was terminated effective November 30,201(3.
On December 10, 2010, T. Bihm and S. Bihm formed their own instrument calibration business (including the calibration, selling, buying, rental, and repair of instrumentation) initially known as Quality Calibration Services, LLC, but shortly thereafter, changed to Bihm Calibration Services, LLC (BCS). It is undisputed that the Bihms’ new business is in direct competition with Deca. After resigning, the Bihms requested that Callaway pay them $750,000.00 for the Deca shares he gave to T. Bihm. Callaway refused, and this litigation ensued.
PROCEDURAL HISTORY
This lawsuit began in January 2011 with a Petition For Involuntary Dissolution of a Corporation filed by T. Bihm and S. Bihm, averring that they were the owners of not less than 20 per cent of the shares of Deca, and as such, they were entitled to seek involuntary dissolution pursuant, to La. R.S. 12:143. {repealed by 2014 La. Acts, No. 328, § 5, eff. Jan. 1, 2015). T. Bihm and S. Bihm. alleged that Deca, the company for which they both had been employed and in which T. Bihm owned stock, was guilty of “gross and .persistent” ultra vires acts. The district court granted Deca and Calla-way’s exception of no right of action and dismissed the Bihms’ petition for involuntary dissolution of Deca. In a prior appeal, this court affirmed the district court’s judgment. Bihm v. Deca Systems, Inc., 2013-2247 (La. App. 1 Cir. 6/6/14), 2014 WL 3702473 (unpublished), writ denied, 2014-1452 (La. 10/10/14), 151 So.3d 585.
| (¡This appeal before, us now arises out of a reconventional demand filed on May 19, 2011, by Deca and Callaway against T. Bihm, and later amended to add S. Bihm and BCS as additional defendants in reconvention.[3] The original reconven-tional demand asserted claims against T. Bihm for ingratitude toward Callaway and his misappropriation of Deca’s funds. Deca and Callaway averred that Callaway gratuitously donated 36 shares of Deca stock to T. Bihm during the many years that T. Bihm was employed by him at Deca, “as [T. Bihm] was being groomed to one day lead the corporation.” The reconventional demand alleged T. Bihm’s ingratitude toward Callaway, reflected by T, Bihm’s acts of “cruel treatment and/or grievous injuries,” as the basis for Callaway’s right to seek revocation .of said donations. The demand also alleged a misappropriation of Deca’s funds by T. Bihm, in the form of unauthorized purchases, and payments made by him to himself and/or S. Bihm, claiming these acts were ultra vires acts and a breach of the fiduciary duty owed by T. Bihm to Deca, as an officer and director of .the company. The demand additionally *474 alleged T. Bihm possessed intellectual property belonging to Deca that he had refused to return despite amicable demand. Deca sought monetary damages for the misappropriation claims asserted against T. Bihm, and Callaway sought a revocation of the donations of stock.
On January 17, 2012, Deca and Callaway filed a supplemental reconventional demand asserting additional claims against T. Bihm for the misappropriation and use of Deca’s confidential and proprietary trade secret information. In this supplemental demand, Deca and Callaway also alleged that T. Bihm engaged in unfair methods of competition in violation of LUTPA and intentional interference with business relations. The supplemental demand averred that in December 2010, T. Bihm created his own company, Quality Calibration Services, LLC, which company later was renamed BCS. Deca and Calla-way alleged that BCS engaged in substantially the same calibrating |7business as Deca, and that T. Bihm misappropriated Deca’s confidential, proprietary, and/or trade secret information to entice and solicit Deca’s customers and to divert business from Deca to BCS. Deca and Callaway alleged T. Bihm’s actions constituted a violation of LUTPA, La. R.S. 51:1401 et seq., and that Deca suffered and continued to suffer damages of lost revenues, loss of customer relationships, and injury to business reputation and goodwill as a result thereof, entitling Deca and Callaway to judgment on the demand in their favor with a monetary award in compensation therefor. Deca and Callaway reiterated their claims that T. Bihm breached his fiduciary duty and duty of loyalty to Deca; they further asserted that T. Bihm acted wantonly and maliciously, and intentionally interfered with Deca’s business relations. In addition to monetary damages, Deca and Callaway sought injunctive relief, prohibiting T. Bihm from further injuring Deca’s customer relationships and business reputation and goodwill. Also, Deca and Callaway asserted a claim for the recovery of movable property that belonged to Deca, but was in the unlawful possession of T. Bihm, and requested an order compelling T. Bihm to deliver those movables to Deca. Finally, Deca and Callaway also reasserted a claim for attorney fees, costs, and interest in accordance with law.
On October 23, 2013, Deca and Callaway filed a “second amended, supplemental and restated” reconventional demand to add additional claims against T. Bihm and new claims against both S. Bihm and BCS for unfair trade practices, and against S. Bihm for breach of loyalty and fiduciary duties and misappropriation of Deca’s funds (conversion). They alleged that T. Bihm and S. Bihm used computers and proprietary software and/or information stored on various forms of electronic media belonging to Deca in the establishment of BCS and for the purpose of competing with Deca in its business. Deca and Callaway further alleged that the misappropriated information was confidential and constituted trade secrets of Deca not generally known or readily ascertainable by Deca’s competitors. They specifically alleged that BCS and T. Bihm were soliciting, inducing, encouraging, enticing, and attempting to influence current and former clients of Deca to divert business from Deca to BCS.
IsAlso in this second supplemental demand, Deca and Callaway provided a more detailed account concerning the acts by T. Bihm that they alleged constituted ingratitude and formed the basis of Callaway’s claim for revocation of the donations to T. Bihm of Deca stock. This demand also provided an itemized and detailed list of the items that form the basis of their claim against T. Bihm and S. Bihm for conversion. Finally, this second amended supplemental demand added a spoliation of evi *475 dence claim against T. Bihm, alleging that despite having received a “preservation letter” ordering the Bihm parties to refrain from destroying, concealing, or altering any paper or electronic files and other data generated by and/or stored on computers in their possession, T. Bihm had executed a program named “CCleaner” on the computers used at BCS to overwrite and delete computer files and data that had been stored on BCS’s computer hard drive, in such a way that those files and data could not be recovered. They further alleged that T. Bihm acted willfully, wrongfully, and intentionally, with conscious disregard of the probable serious harm to Deca and Callaway caused by this destruction of physical evidence. Deca and Callaway realleged every previous allegation against T, Bihm for breach of fiduciary duty and duty of loyalty to Deca and intentional interference with business relations. They sought an award for damages against the Bihm parties jointly, severally, and in solido, including attorney fees, costs, expert witness fees, and interest.
Finally, in a third amended, supplemental, and restated reconventional demand filed on July 31, 2014, Deca and Callaway added a claim for restitutionary damages under LUTSA for violations thereof by the Bihm parties and asserted they were solidarity liable for all monetary damages, recoverable as a result of the trade secret misappropriation, and all other relief pursuant to La. R.S. 51:1409 et seq. In conclusion, Deca and Callaway prayed for judgment against the Bihm parties, jointly, severally, and in solido, awarding damages, including attorney fees, costs, expert witness fees, and interest, and any further relief the court deemed necessary and proper. In October 2014, the Bihm parties answered the reconventional demand, as supplemented and amended, and filed affirmative defenses.
INACTION OF THE DISTRICT COURT
Following a bench trial on April 21, 2015, the district court ruled in favor of Deca and Callaway on all claims raised in their original and supplemented reconven-tional demands, and rendered judgment to that effect on July 15, 2015, the details of which are discussed below where pertinent. The district court also issued lengthy and detailed written reasons for judgment, carefully and categorically detailing the evidence in the record on which it relied. As noted herein, where the record overwhelmingly supports the findings of the district court, we summarize the essence of that supporting evidence, and adopt herein by reference, the district court’s more detailed factual findings as set forth in its written reasons.
ASSIGNMENTS OF ERROR
The Bihm parties assert the following assignments of error:
1. The Trial Court erred in finding that the design and content of Deca’s Microsoft Access data base, including the Deca customer list, was a trade secret under the LUTPA and [LUTSA].
2. The Trial Court erred in awarding Deca $83,041.16 for conversion or misappropriation of Deca Funds.
3. The Trial Court erred in awarding base damages of $739,319.00, under the LUTPA and for intentional interference with business relations, and in trebling that amount for damages under the LUTPA.
4. The Trial Court erred in ordering the rescission of Callaway’s transfer to Timmy Bihm of 36 shares of Deca common stock and the return of any dividends paid to Timmy Bihm by Deca on the grounds of ingratitude.
*476 STANDARD OF REVIEW
The manifest error standard of review applies to the determination of what constitutes an unfair trade practice. Pierrotti v. Johnson, 2016-0204 (La. App. 1 Cir. 10/28/16), 2016 WL 6330423 (unpublished), writ denied, 2017-0002 (La. 2/10/17), 216 So.3d 47. A court of appeal may not set aside a trial court’s finding of fact in -the absence of manifest error. The two-part test for the appellate review of a factual finding is: 1) whether there is a reasonable factual basis in the record for the finding of the trial court; and 2) whether the record further establishes that the finding is not manifestly erroneous. Mart v. Hill, 505 So.2d 1120, 1127 (La. 1987). Thus, the issue to be resolved is not whether the fact finder was right or wrong, but whether the fact finder’s I ^conclusion was a reasonable one. Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989). When there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous. Stobart v. State, Through Department of Transportation & Development, 617 So.2d 880, 883 (La. 1993). If the. trial court’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106, 1112 (La. 1990).
DISCUSSION/ANALYSIS
Spoliation of Evidence
With regard to the spoliation of evidence claim, arising from T. Bihm’s failure to respond to discovery requests seeking access to the computer hardware, software, databases, and USB drives utilized by BCS, the district court found the evidence sufficient to find T. -Bihm was. guilty as alleged. The Bihm parties have not assigned error to this finding, and therefore, it is not before. us. However, the facts revealed by the evidence relied on by the district court in making this finding are equally relevant to establishing elements of the defendants’ claims under LUTPA and LUTSA to which the Bihms’ assignments of error pertain. To that extent, we find the district court’s findings noteworthy.
At trial, T. Bihm confirmed that he, through his counsel, was notified by an “evidence preservation letter” that the Bihm parties were not to destroy or conceal evidence that may be relevant to the claims asserted against him. Nevertheless, the district' court noted evidence that T. Bihm, on more than one occasion during discovery, executed a program called “CCleaner,” with the “Wipe Free Space” setting selected on the computers at BCS, to overwrite deleted computer files and deliberately destroy data stored on the computer hard drives so that it could not be recovered. The district court found that, “because Timmy Bihm knew that the physical evidence contained on his and Shelly Bihm’s computer hard drives was critical, material, and highly relevant evidence to ... claims against him” and that “the evidence and testimony at trial unequivocally [ 1, established, more probably than not, [the Bihm parties] not only manually deleted electronic files on the computers ... .to destroy evidence, but they also, utilized ‘CCleaner’ with the ‘Wipe Free Space’ setting selected to intentionally overwrite the deleted computer files such that the files could never be recovered.” The district court further found that T. Bihm concealed or failed to produce several USB storage devices that had been connected to computers at Deca and later attached to the computers at BCS, an additional basis on which it. found T. Bihm *477 was guilty of spoliation of evidence. The record supports these findings.
Rescission of Stock for Ingratitude (Assignment of Error 4)
The district court' found the evidence sufficiently -established acts of ingratitude committed by T. Bihm toward Callaway to warrant the revocation of the gratuitous donations to him of Deca stock as well as the return of- any additional dividends paid to T. Bihm as fruits of those donations. In assignment of error number four, the ■ Bihm parties argue that T. Bihm’s actions did not meet the Louisiana Civil Code requirements .for rescission of those donations for ingratitude. The district court found revocation was the proper remedy based on the “‘depth of ingratitude and perniciousness’ displayed by the Bihms—not only the allegations of breach of fiduciary duty.” The court, citing relevant jurisprudence, noted that T. Bihm “publically made unsubstantiated accusations against Callaway and committed the following acts, which constitute cruel treatment and/or grievous injury toward Calla-way” as required by La. C.C. art, 1557(2):
1) he filed suit against Callaway falsely swearing he committed gross and persistent [ultra vires acts ], which damaged the corporation;
2) he filed suit seeking the involuntary dissolution of Deca, to the great distress of Callaway who has spent the majority of his life building Deca into a successful business;
3) he demanded in correspondence that he be given $750,000.00 or else he would seek to destroy Deca;
4) he accused Gerald Callaway of committing fraud;
5) he defrauded Deca out of money and property by abusing the trust placed in him by Callaway;
6) he gave.unauthorized raises to his wife, who was a co-conspirator in conversion of money belonging to Deca while she was employed as the ■ company bookkeeper;
7) he misappropriated and used proprietary' information and data belonging to Deca to help him establish Bihm Calibration and unfairly competed with Deca in its business, including use of | ^confidential pricing information to lure one of Deca’s biggest customers away; and
8) he feels no remorse for the above-referenced acts of ingratitude he expressed toward Callaway.
Without disputing any of the specific aforementioned findings of the district court, the Bihm parties argue that T. Bihm acted, not with an intent to harm, but rather “out of desperation, despair[,] and anguish -over the loss of a 20 year career and worry over how he would support his family.” The Bihm parties claim T. Bihm’s actions were “largely defensive-measures aimed at preservation of life, livelihood[,] and property,” in response to Callaway’s actions in amending Deca’s Articles of Incorporation by removing the cumulative voting rights and other provisions that protected T. Bihm’s rights as a minority shareholder. However, the record reveals that Callaway’s ■ action in amending the articles of incorporation was itself* a protective measure, after becoming aware of the suspected misappropriation of funds by T. Bihm and S. Bihm. Moreover, the Bihm parties’ “defensive measures” argument falls in light of this, court’s earlier decision finding T. Bihm failed to establish that Callaway’s act in amending the articles was wrongful and dismissing T. Bihm’s action to dissolve the corporation, which notably, the Bihm parties fail to address.
It may well be that T. Bihm was worried about his livelihood and the future of his employment at Deca; however, the record *478 fails to reveal that Callaway caused any of these concerns. More importantly, though, the Bihm parties cite no law that would justify, condone, and/or forgive his wrongful and disloyal actions culminating in cruel treatment toward Callaway on the basis of concern over one’s livelihood, particularly when that concern is caused by one’s own actions.
The record fully supports the revocation of T. Bihm’s shares of Deca stock based on the evidence of ingratitude detailed above. Moreover, we note that in its reasons for judgment, the district court provided a detailed statutory and jurisprudential analysis as the basis for its conclusion that those stock donations were gratuitous, as opposed to onerous or remunerative, as alleged by the Bihm parties. The district court cited the statutory provisions concerning the nature of donations, the applicable jurisprudence, and |13analyzed the evidence presented according to the requisite factors—the intent of the donor and the amount of the donation compared to the value of the services rendered. Our review of the record reveals it wholly supports the well-written and thorough analysis provided by the district court in written reasons; we find it unnecessary to duplicate that analysis herein and adopt it as our own, by reference. Because the record fully supports the district court’s findings, and the Bihm parties have not-shown any manifest error, we affirm the portion of the judgment ordering revocation of the donations of stock and dividends paid on the basis of the ingratitude of T. Bihm.
Conversion/Misappropriation of Deca Funds (Assignment of Error 2)
The district court found certain acts of T. Bihm and S. Bihm, i.e., the repeated use of company credit cards, which they knew were to be used for Deca purposes only, for numerous personal purchases (food, gas, sporting goods, tools, entertainment, etc.); the failure to provide receipts for said purchases; the outright disbursement of cash to themselves; and S. Bihm’s writing Deca checks to “cash” (totaling $8,400.00) that were endorsed by either of them and used by them for personal, non-business related expenses, and falsifying entrees into the bookkeeping system. to cover up her actions, constituted conversion and misappropriation of Deca funds and awarded defendants $88,041.16 in damages therefor. The Bihm parties argue the court erred in so finding because according to them, the evidence established that Callaway, through his own practices of using company funds to pay personal expenses and deducting them as business expenses, “created a culture within Deca” that suggested that the use of Deca funds by stockholders (owners) to pay personal expenses was “acceptable.” Additionally, they argue that these claims were prescribed by liberative prescription of one year.
A conversion is an act in derogation of the plaintiffs possessory rights and any wrongful exercise or assumption of authority over another’s goods, depriving him of the possession, permanently or for an indefinite time. Quealy v. Paine, Webber, Jackson & Curtis, Inc., 475 So.2d 756, 760 (La. 1985). A conversion is committed when any of the following occurs: 1) possession is acquired in an unauthorized manner; 2) the chattel is removed from one place to another with the intent to exercise control over itju 3) possession of the chattel is transferred without authority; 4) possession is withheld from the owner or possessor; 5) the chattel is altered or destroyed; 6) the chattel is used improperly; or 7) ownership is asserted over the chattel. Dual Drilling Co. v. Mills Equipment Investments, Inc., 98-0343 (La. 12/1/98), 721 So.2d 853, 857.
*479 In finding the evidence sufficient to establish that the Bihms were guilty of conversion and misappropriation, the district court noted in written reasons for judgment:
The Court finds that the weight and breadth of the evidence presented at trial, particularly the Bihms’ own admission that they used Deca funds for personal expenses!,] coupled with the receipts obtained by [Ms.] Cockerham for various vendors and the calendar showing the pattern of them behavior, showed that the Bihms unequivocally took advantage of their positions within Deca, breached the trust placed in them by Callaway, and misappropriated Deca funds to supplement their income and provide for their lifestyle of living beyond their means. It is clear that the Bihms felt that what they were being paid for their honest work was not enough, then took from the company.
***
The Bihms made hundreds of unauthorized purchases using checks, cash, and credit cards belonging to Deca for their personal use and benefit.... While the Bihms were employed with Deca, Deca had a company policy that company credit cards were to be used for business expenses only and that all receipts for purchases on company credit cards were to be turned over to the bookkeeper for Deca. [Citing the testimony of Gerald Callaway, Van Foster, Theresa Cockerham, and Joseph Pete Vincent.] Moreover, all company credit card statements were to be reconciled monthly.... The Bihms made unauthorized disbursements of money to themselves, while Shelly Bihm sought to cover up and disguise the unlawful activities as the corporation’s bookkeeper by falsifying entries into the Peachtree financial system to hide the true nature of the expenditures. [Again, citing the above referenced testimonies.]
Timmy Bihm, Shelly Bihm, and/or their family also made unauthorized, non-business related purchases on Deca’s Chase and Citibank corporate accounts ....
Additionally, the Bihms wrote at least three separate checks made payable to “cash” that were either endorsed by Timmy Bihm or Shelly Bihm totaling $3,400.00 that were not authorized for business purposes....
[[Image here]]
The Bihms’ argument that Deca and Callaway created a culture suggesting that use of company credit cards by the owners is no defense to the clear facts that the Bihms concealed their use of company funds for reasons not relating to company business.
11/Without itemizing each and every act constituting conversion and misappropriation of Deca funds committed by the Bihms, our review of the record wholly supports the district court’s express findings above, as well as its conclusion that these acts constitute conversion/misappropriation. The Bihms do not deny they committed the acts established by the evidence. Instead, they defend their actions by introducing evidence of Callaway’s use of his company’s credit cards for personal items, attempting to show that Callaway established a “corporate tax avoidance strategy” culture within the company, and that they were just doing what Callaway did. Our review reveals that such evidence falls woefully short of establishing any strategy created by Callaway with the intent to defraud the IRS or otherwise take wrongful advantage of Deca’s C corporation status. Nor did Callaway’s actions provide any kind of basis from which the Bihms could have inferred they were entitled to misappropriate cash and checks and *480 use two company credit cards for their own personal use. Callaway’s actions and spending habits are not at issue herein and do nothing to repudiate the wrongfulness of the Bihms’ actions. The Bihms did not deny that they were aware of the company policy that company issued credit cards were to be used for business expenses only, nor did they deny that the majority of the purchases they made with Deca’s credit cards were for their own personal use. No explanation was given for S. Bihm’s attempts to manipulate the bookkeeping records to disguise the wrongful conversion and misappropriation of Deca funds. Accordingly, we find no merit to this portion of this assignment of error. The Bihm parties do not challenge the amount of the award on appeal, but in addition to the company culture defense, they argue that BCS was not in existence at that time and the claim has prescribed.
Prescription
The district court also rejected the Bihm parties’ argument that the conversion and misappropriation claims were prescribed because they were asserted in a pleading filed more than one year following said acts of conversion and misappropriation. A conversion action sounds in tort and is subject to a one-year liberative prescriptive period. See La. C.C. art. 3492; Gallant Investments, Ltd. v. Illinois Cent. R. Co., 2008-1404 (La. App. 1 Cir. 2/13/09), 7 So.3d 12, 17-18. Generally, the party pleading prescription has the burden of proving the facts supporting the exception, A prescriptive period will begin to run even if the injured party does not have actual knowledge of facts that would entitle him to bring a suit as long as there is constructive knowledge of same. Gallant, 7 So.3d at 19. Prescription commences upon whatever notice is enough to excite attention and put the. injured party on guard or call for inquiry. Hogg v. Chevron USA, Inc., 2009-2632 (La. 7/6/10), 45 So.3d 991, 997.
The Bihni parties assert that Cal-laway and Deca are not entitled to the application of contra non valentem to suspend the running of the one-year prescriptive period during the time1 period in which the cause of action is not known or reasonably knowable by the plaintiff, arguing that Callaway’s own failure to exercise diligence in the management of his business and to institute reasonable internal control procedures bar his right to claim the benefit of any such rule. The district court disagreed:
Contrary to the Bihms’ assertion, the Court finds that the testimony and evidence showed that the Bihms concealed their conversion of Deca funds and that their theft was not discovered until after Shelly Bihm-left employment in July of 2010. Accordingly, Deca may assert the third ground for contra non valentem because the Bihms, the debtors themselves, effectually prevented Deca and [Callaway], the creditors, from availing themselves of this cause of action. Deca filed its. claim for conversion ■ of Deca funds against the Bihms on May 19, 2011, within a .year of when the Bihms’ theft was discovered. Shelly Bihm, as the company bookkeeper, abused. the trust placed in her and concealed her and Timmy Bihm’s conduct from Deca. Timmy Bihm was complacent in Shelly Bihm’s activities and willingly participated. The fact that Timmy Bihm, as a corporate officer, failed to notify Calla-way as the only other shareholder is blatant concealment.
We agree with the district court. The Bihms’ own acts, in attempting to conceal their wrongdoing from being discovered by Callaway or anyone else at Deca, serve as a proper basis for the application of contra non valentem in that their own *481 efforts were aimed at preventing Callaway from becoming aware of their improper acts and the fact that the acts were actionable. Indeed, the record supports that once Callaway fully trained- S, Bihm as the company’s bookkeeper, he placed her in a position of trust and vested her with the authority to maintain the books and the company’s accounting and financial management without the need for supervision. He relied on her competency and honesty| 17 and had no reason to believe that the financial records she produced were anything other than a truthful and accurate portrayal of the company’s assets and cash flow. Thus, prescription on the claim for conversion and misappropriation of funds did not begin to run until the bookkeeper hired to replace S. Bihm in August 2010, Ms. Cockerham, within weeks of her hiring date, discovered and brought to Calla-way’s attention the numerous discrepancies in the books. Callaway’s claim against the Bihms for conversion of Deca funds was filed on May 19, 2011, within one year from the date he discovered the Bihms’ acts constituting conversion and misappropriation. Accordingly, the claims were not prescribed. This.portion of this assignment of error also lacks merit.
Was Deca’s Microsoft Access database a trade secret under LUTPA and LUTSA? (Assignment of Error 1)
In their first assignment of error, the Bihm parties argue the district court erred in finding that the design and content of Deca’s Microsoft Access database, including the Deca customer list, were trade secrets under LUTPA and LUTSA. First, they claim there was no evidence presented that Deca/Callaway took any reasonable security measures to protect the data. They also assert that the evidence failed to show that any of the “trade secret” information contained in Deca’s computers was password protected, and further, there was no evidence that the Bihms, or anyone who worked at Deca and had access to the computers, were ever advised that the information was confidential or that it consisted of protected trade secrets. They also argue that there was no evidence presented that any employee had ever been asked to sign a confidentiality agreement or a non-compete agreement. '
In' the réconventional demands, Deca and Callaway claimed that T. Bihm, before leaving his employment with Deca, took and utilized software applications and databases that belonged to Deca, containing confidential and proprietary information. They further alleged that the Bihms utilized Deca’s information in the company they formed in competition with Deca.
|1RLUTSA/LUTPA Claims
Defendants in their reconventional demands allege violations by the Bihm parties under both LUTSA and LUTPA. The acts are similar in that they both regulate and balance the rights - of parties engaged in competitive commerce with the goal of striking a balance between free enterprise and protecting business, owners by prohibiting unfair or deceptive acts or practices in the conduct of trade. Both acts provide injunctive relief and damages for violations thereunder. The conduct prohibited by both acts is aimed at ¡achieving this common goal; LUTSA is more specific and narrow and prohibits the theft, bribery, misrepresentation, .breach, or misappropriation of a company’s “trade secrets,” (defined in the act and discussed in more detail below); LUTPA contains more general prohibitory language, encompassing “unfair methods of competition”, and “unfair or deceptive acts or practices.” For example, allegations of acts constituting a prohibited breach of confidence may not meet the requirements, of a trade secret by definition, yet fall within the scope of prohibited conduct under LUTPA. B & G *482 Crane Serv., L.L.C. v. Duvic, 2005-1798 (La. App. 1 Cir. 5/5/06), 935 So.2d 164, 167, writ denied, 2006-1820 (La. 10/27/06), 939 So.2d 1280. Under LUTPA, the plaintiff need only prove: 1) possession by the plaintiff of knowledge or information which is not generally known, 2) communication of this knowledge or information by the plaintiff to the defendant under an express or implied agreement limiting its use or disclosure by the defendant, and 3) use or disclosure by the defendant of the information to the injury of the plaintiff. See Engineered Mechanical Services, Inc. v. Langlois, 464 So.2d 329, 334 (La. App. 1 Cir. 1984), writ denied, 467 So.2d 531 (La. 1985). Because there is overlap in the scope of coverage of the acts, claims of violations under both acts ai^e frequently pled and tried together, as reflected by the jurisprudence that oftentimes analyzes evidence against the backdrop of both acts. See e.g., B & G Crane Serv., L.L.C., 935 So.2d at 167 (where this court noted “a breach of fiduciary claim based on the misappropriation of confidential information, although technically not a trade secret, is also recognized as grounds for injunctive relief under [LUTPA].”) The specific pertinent provisions of each act are set|]9 forth below, followed by an analysis of the evidence presented as it relates to claims falling under either, or both, acts.
LUTSA
Although LUTSA does not directly state its purpose, the comments following each section of the act (all of which appear in the original 1981 La. Acts, No. 462) are replete with references to unfair commercial advantage resulting from disclosure of trade secrets to competitors. Stork-Werkspoor Diesel V.V. v. Koek, 534 So.2d 983, 985 (La. App. 5 Cir. 1988). The purpose of LUTSA is to prevent one person or business from profiting from a trade secret developed by another, because it would thus be acquiring free competitive advantage. Id. A trade secret is defined as “information, including a formula, pattern, compilation, program, device, method, technique, or process, that:”
(a) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and
(b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
La. R.S. 51:1431(4). The act also provides that actual or threatened misappropriation may be enjoined. La. R.S. 51:1432(A). Misappropriation is defined in the act as:
(a) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
(b) disclosure or use of a trade secret of another without express or implied consent by a person who:
(i) used improper means to acquire knowledge of the trade secret; or
(ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
(aa) derived from or through a person who had utilized improper means to acquire it;
(bb) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
(cc) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
*483 (iii) before a material change of his position, knew or had reason to know that this was a trade secret and that |2nknowledge of it had been acquired by accident or mistake.
La. R.S. 51:1431(2). The act, pursuant to La. R.S. 51:1433, also provides for the recovery of damages for actual loss caused by misappropriation, and for unjust enrichment caused by misappropriation, but not taken into account in computing damages for actual loss. Moreover, the court has the authority to award reasonable attorney fees to the prevailing party upon a finding of bad faith, or willful and malicious misappropriation. See. La. R.S. 51:1434.
The threshold inquiry is whether the information at issue is indeed a legally protected trade secret; the second element is whether an express or implied contractual or confidential relationship existed between the parties which obligated the party receiving the secret information not to disclose it; and Finally, whether the party receiving the secret information wrongfully disclosed the information to the injury of the plaintiff. B & G Crane Serv., L.L.C., 935 So.2d at 167. A customer list or special pricing list may be a trade secret if efforts are made to maintain its secrecy. Pontchartrain Medical Labs, Inc. v. Roche Biomedical Laboratories, Inc., 95-2260 (La. App. 1 Cir. 6/28/96), 677 So.2d 1086, 1090.
LUTPA
In LUTPA, the legislature declared it unlawful to engage in “unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]” La. R.S. 51:1405(A). Louisiana Revised Statute 51:1409(A) grants a private right of action to “[a]ny person who suffers any ascertainable loss of money or movable property, corporeal or incorporeal” as a result of a violation of LUTPA to recover actual damages and, if such damages are awarded, reasonable attorney fees and costs. That provision also provides the awarding of treble the actual damages sustained if the court finds the unfair or deceptive method, act, or practice was knowingly used, after being put on notice by the attorney general.
LUTPA does not enumerate those instances of conduct that constitute unfair trade practices, other than La. R.S. 51:1405(A) providing that “[u]nfair methods of competition [21and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.” See Van Hoose v. Gravois, 2011-0976 (La. App. 1 Cir. 7/7/11), 70 So.3d 1017, 1023. Because of the broad sweep of this language, Louisiana courts determine what is a LUTPA violation on a case-by-case basis. Quality Environmental Processes, Inc. v. I.P. Petroleum Co., Inc., 2013-1582 (La. 5/7/14), 144 So.3d 1011, 1025. This court has consistently held that in establishing a LUTPA claim, a plaintiff must show that the alleged conduct offends established public policy and is. immoral, unethical, oppressive, unscrupulous, or substantially injurious. Cheramie Services, Inc. v. Shell Deepwater Production, Inc., 2009-1633 (La. 4/23/10), 35 So.3d 1053, 1059.
Evidence Presented/Analysis
The record reveals Callaway suspected T. Bihm of wrongdoing and unauthorized takings toward the very end of his employment and confirmed those suspicions following T. Bihm’s termination from Deca. Callaway hired a private investigator 'and launched an investigation into T. Bihm’s actions and the computer hardware, software, databases, and USB drives utilized by the Bihms in the operation of BCS. The results of that investigation were entered into evidence at trial by defendants.
*484 . This investigation revealed, by video surveillance also'entered into evidence at trial, that T. Bihm entered the Deca building early in the morning, prior to normal business hours, on November 22, 2010, his last day of work at Deca, and was seen accessing and copying data from- Deca’s computers. The record further -discloses that counsel for the defendants . sent a letter dated February 2, 2012, to the Bihm parties, through their counsel, giving them notice not to destroy, conceal, or alter -any paper or electronic files and/or other data generated by and/or stored on computers and storage media or any other electronic media in the possession of them and/or BCS. These items were specifically requested for inspection during discovery. The Bihm parties refused to allow access to such discovery, necessitating the filing by the defendants of two motions to compel. Despite admissions by each of the Bihms as well as their counsel that théy had received and understood the “preservation letter,” the facts reveal that just prior tolaa each of the hearings, on the motions to compel, the Bihms/BCS executed a program on the computers utilized by BCS liamed “CCleaner,” on the “Wipe Free Space” setting, to overwrite deleted computer files and destroy data stored on the computer, rendering such information unrecoverable. (The evidence shows that the “Wipe Free Space” setting is not a default setting; it must be specifically selected, and confirmed after being warned of the permanency of the deletions, by the person running the program.) The facts also revealed the use of the-same, “CCleaner” program by T. Bihm/BCS on all BCS computers on a third occasion, just prior to the defendants’ expert’s scheduled inspection of the computers.
The record further reveals that T. Bihm failed to produce multiple USB external storage devices that, were shown to-have been connected to computers at Deca during T. Bihm’s employment, and which were later attached to the BCS computers. Additionally, T. Bihm failed to produce a laptop computer that had been purchased for him with Deca funds during his employment that was known to -be in his possession and contained Deca’s computer’s back-up. files’ information, and which was later configured to connect to the wireless network at BCS.
The record established that both S. Bihm and T. Bihm had numerous file path folders in their computers entitled “Deca” that had been deleted-and were no longer contained on their BCS computers at the time of inspection. There is also evidence that the registry of BCS’s computers recorded two “crash events”, that1 occurred while those computers were. running Deca’s two main database files. Expert testimony also established that the Bihms used one of Deca’s database files as a template for the creation of their own database for use by BCS..According to the expert,: the two databases (Deca’s and BCS’s), containing customer and contact information, pricing information, customized calibration procedures and automated calibration of client’s instrumentation, as well as the calibration history for instruments, have striking structural similarities, and the testimony detailed the many ways in which he found the databases were “too similar to be coincidental.” The use of Deca’s databases allowed the Bihml ¾¾ parties to gain a competitive advantage and “fast start” to the business, to solicit Deca’s customers, and to directly and unfairly compete with Deca.
Despite the foregoing evidence, the Bihm parties claim the district court erred in finding that Deca carried its burden of proving that the design and content of Deca’s database, including the customer list, were trade secrets under LUTPA and LUTSA, because Deca failed to prove that *485 it took reasonable steps to maintain the information’s secrecy, as required by La. R.S. 51:1431(4)(b). They note the absence of any allegation that the- Bihm parties violated any copyright or patent law or that any of the information or data relating to the claim is protectable under federal copyright or patent law. They further argue that Deca has not applied for or obtained a patent. We note at this juncture that neither LTJTSA nor LUTPA require a violation of copyright or patent law to state a cause of action thereunder. Additionally, the courts have held that a trade practice is unfair when it offends public policy, and when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. Cheramie Services, Inc., 35 So.3d at 1059.
A former employee who enters business in competition with his former employer necessarily utilizes the experience he acquired and the skills he developed while in a former employment. By law, the employer may be entitled to protection against wrongful appropriation and use by former employees of things specially developed by the employer in his business, “such as lists of customers ... whose regular patronage has been acquired by the employer’s advertising, solicitation[] and organized effort.” Boncosky Services, Inc. v. Lampo, 98-2239 (La. App. 1 Cir. 11/5/99), 751 So.2d 278, 287, writ denied, 2000-0322 (La. 3/24/00), 758 So.2d 798 (emphasis added). Considerations as to the type of protection to be afforded to the employer in a specific case include the manner in which and the purpose for which customer lists are compiled; the conduct and motivation' of -the employee before and after termination and the nature of the representations made to the customer by the former employee; and the existence of a scheme to take over all or a substantial part of the former employer’s business, or of an intent to injure the former employer’s business. Id. A critical factor is a defendant’s | ^motivation; the actions must . have been taken with the specific purpose of harming the competition. Id.
Specifically, regarding' the Bihm parties’ argument that Deca did nothing to ensure the secrecy of its purported confidential information,' the record established the following. The primary building in which Deca operates its business has controlled access, consisting of double deadbolt locks and keys that are not readily duplicable; video surveillance was installed and used to monitor access to the building and computers; the information on Deca’s computers was not disseminated, to the public, and was maintained on computers that did not have access to the internet; the information was not otherwise available to nor accessible by anyone outside the building; only authorized employees at Deca had access to the computer information; the .employees were instructed that all information prepared,by and collected and developed for use by Deca was confidential and not to be disbursed; and that the unauthorized sharing of such private Deca information was grounds for immediate termination. Moreover, as detailed above, the fact that T. Bihm and S. Bihm knew that the information on Deca’s computers was secret and confidential is inferable from the manner in which the Bihms proceeded to confiscate that information, secretly copied the information, and downloaded the files to their BCS computers. The secretive manner in which the Bihms conducted themselves also establishes that they knew that taking the computer files and. software was wrong, and the evidence of their attempts to hide and to cover up the contents of the computers at BCS, after receiving the letter ordering them to preserve and not to *486 destroy information contained on their BCS computers, indicates their wrongful intent in taking the information as well as their knowledge that information they took was confidential and proprietary to Deca.
T. Bihm claimed much of the credit for developing Deca’s computer software for specific use by Deca, personalizing it to meet Deca’s needs. In doing so, T. Bihm revealed his knowledge that such software and electronic data was unique and had been specifically personalized for Deca’s use for over fifteen years. Thus, his claim that he did not know the computer software was confidential and intended for Deca’s private use only is belied by his own testimony regarding his involvement in developing it. The record! as overwhelmingly establishes that Deca used the available software to organize and personalize customer information into files and lists, containing proprietary pricing information; Deca’s automated procedures; service methods and techniques; detailed customer historical data such as repair and calibration schedules; Deca’s billing system; and Deca’s sales and rental history per customer, all of which were unique to Deca’s business operations and used only by Deca employees.
The record also establishes that the information taken from Deca enabled the Bihm parties to effectuate a rapid “start-up” of BCS, giving it-a competitive advantage over Deca and other established businesses in existence. The computer information taken by the Bihms allowed them to identify, solicit, encourage, and entice customers to do business with them, given that BCS had all of the historical records compiled by Deca concerning each of the customer’s instrumentation, calibration and repairs thereof, and the timetables associated with the proper upkeep of the customers’ accounts. Indeed, the record reveals that 94 percent of BCS’s business upon start-up was with former customers of Deca. The record further establishes that the Bihm parties, by virtue of their employment and participation therein with Deca, were aware that those lists were personally created and customized by Deca for confidential use in providing its customers with high quality service, and of the advantage that they would gain in enticing Deca’s customers to do business with BCS.
Based on the foregoing, we do not find that the district court manifestly erred in concluding that the content on Deca’s computer system that was taken during off-hours and in secrecy by T. Bihm was confidential and customized, and one in which Deca had a proprietary interest. Moreover, it is also clear from the record that information was misappropriated by T. Bihm with the specific intention of using it in the Bihm parties’ new business to gain an undue and improper competitive advantage over Deca. Accordingly, the district court did not err in concluding that such misappropriated information constituted a trade secret under LUTPA and LUTSA. Moreover, even if the information were deemed to fall short of the level of secrecy required to constitute a trade secret, the evidence supports a finding that the Bihm parties wrongfully misappropriated it to gain ⅛ competitive edge over, and cause injuries to Deca and Callaway. There is no merit to this assignment of error. Whether the district court otherwise erred in finding other violations of LUT-PA, ie., unfair acts of competition and intentional interference with business practices, and awarding treble damages therefor is addressed below in connection with Assignment of Error 3.
Base Award of $739,319.00, and Trebling of Such for Intentional Interference with Business Relations Under LUTPA (Assignment of Error 3)
The Bihm parties challenge the district court’s finding that the defendants are en *487 titled to $739,819.00 and then trebling that amount under LUTPA for the intentional interference with Deca’s business relations on three bases: (1) those claims were prescribed and/or perempted under La. R.S. 51:1409(E); (2) Deca failed to carry its burden of proving the requisite elements of such a claim under LUTPA; and (3) Deca failed to carry its burden of proof as to causation.
The district court found that the Bihm parties’ misappropriations and thereafter, the use of Deca’s confidential, proprietary, and/or trade secret information, that it found constituted a violation of LUTSA, also constituted a violation of LUTPA, as their, actions constituted unfair methods of competition and an unfair act or practice that were injurious to Deca, thus entitling Deca and Callaway to actual and treble damages under LUTPA. The district court specifically found the Bihm parties not only misappropriated Deca’s customer lists and information; but also vendor databases; proprietary pricing information; databases containing Deca’s automated procedures; compilations of information detailing service events, methods, techniques, and/or processes; databases containing historical data on repairs to and calibrations of industrial instruments owned by Deca’s customers; licensed software that was customized to track intake, repair, and billing and to maintain schedules; and pricing information on repairs performed by Deca, parts sold by Deca, and rentals to Deca’s customers.
The district court further found that the foregoing information provided Deca with a means to proactively solicit and timely recertify customers’ instruments, and the Bihm parties’ misappropriation thereof allowed them to compete with Deca on an immediate] 27 basis, by soliciting customers and generating business with them at a much faster rate than they would have without it. We have reviewed the record, particularly the expert testimony of Deca’s expert, Ronald Gagnet, and find it fully supports these findings by the district court. According to Mr. Gagnet, without such misappropriated information, it would have taken the Bihm parties three to five years to' reach the level of success and profit that the company enjoyed within the first two years of start-up; Mr. Gagnet’s testimony provided that, as a direct result of the unfair and deceptive acts of the Bihm parties, Deca suffered actual damages, including lost revenues, loss of business opportunity, loss of customer relationships, and injury to-.Deca’s business reputation and goodwill, as well as attorney fees and costs. The district court additionally found that the unfair and deceptive acts by the Bihm parties were done knowingly,-and even continued despite the Attorney General’s notice to them to cease all unlawful activity, thus entitling Deca to three times the actual damages pursuant to La. R.S. 51:1409(A).
Additionally, the district court. found that the evidence presented also established that T. .Bihm acted wantonly and maliciously, and those, unfair and deceitful actions improperly influenced others, including current and former clients of Deca not to deal with Deca or retain Deca’s services, which constitutes a tortious interference with Deca’s business relations—a separate cause of action warranting an additional award of damages.
Finally, the district court found that the evidence was sufficient to prove the requisite causation element between the Bihm parties’ wrongful acts and the losses suffered by Deca. Based on all of the foregoing, the district court then rendered the following awards in favor of Deca and Cal-laway: $83,041.16 for. the total amount of Deca’s company funds that were converted and/or misappropriated by the Bihms *488 while employed by Deca (the amount- of this award is- not contested); $739,319.00 representing Deca’s lost profits for violations of LUTPA, LUTSA, and the intentional interference with Deea’s business relations (noting that the amount of these damages was proven by. the testimony of Deca’s expert’s testimony); and, a trebling of that amount, of damages) ¾¾ pursuant to Louisiana statutes.. Thus, the monetary award to Deca amounted to a total of $2,300,998.16.
On appeal, the Bihm parties challenge the base damage award of $739,319.00 and the trebling of that amount on three bases: (1) that the claims under LUTPA were prescribed and/or perempted under La. R.S. 51:1409(E); (2) that Deca failed to prove the essential elements of a claim under LUTPA and of the claim for tortious interference with business relations; and (3) that Deca failed to prove causation.
Prescribed/Perempted LUTPA Claims?
A cause of action under LUTPA “shall be prescribed by one year running from the time of the transaction or act which gave rise to this right of action.” La. R.S. 51:1409(E). Although not specified by the statutory language, and despite the use of the word “prescribed” in the statute, the jurisprudence has consistently held that the prescriptive period for a private action pursuant to LUTPA is peremptive. Zeigler v. Hous. Auth. of New Orleans, 2012-1168 (La. App. 4 Cir. 4/24/13), 118 So.3d 442, 451-52; Fox v. Dupree, 633 So.2d 612, 614 (La. App. 1 Cir. 1993), writ denied, 94-0296 (La. 3/25/94), 635 So.2d 233; see also Morris v. Sears, Roebuck and Co., 99-2772 (La. App. 4 Cir. 5/31/00), 765 So.2d 419, 422 (citing La. R.S. 51:1409(E)). Nothing can interfere with the running of a peremptive period. Naghi v. Brener, 2008-2527 (La. 6/26/09), 17 So.3d 919, 925 (citation omitted). A peremptive period cannot be renounced, interrupted or suspended. La. C.C. art. 3461.
As noted earlier in the procedural history, Deca and Callaway filed four separate pleadings raising allegations against the Bihm parties in this matter. They filed an original reconventional demand on May 19, 2011, against only T. Bihm. In this pleading, they asserted T. Bihm’s ingratitude toward Gallaway that warrants revocation of the stock donations (subject of assignment of error no. 1), and T. Bihm’s misappropriation of Deca’s funds through unauthorized purchases on. company credit cards and unauthorized payments made to him, as well as to S. Bihm. Deca and Callaway characterized the acts of misappropriation as ultra vires acts and alleged a breach of the fiduciary duty T, Bihm owed to Deca as an officer and director. This original demand also alleged that T. Bihm Leshas in his possession numerous items of intellectual property which belong to [Deca], which he has refused to return despite amicable demand.”. No further facts were alleged regarding . this- last claim.
It was not until Deca and Callaway filed a supplemental reconventional demand on January 17, 2012, that claims under LUT-PA and LUTSA were asserted,- and only against T. Bihm.[4] S. Bihm and BCS were not added as defendants in reconvention on any of the foregoing claims until October 23, 2013, in a second amending and supplemental and restated reconventional demand. It was then they, were named as *489 solidarity liable obligors with- T. Bihm for all monetary damages, attorney fees, costs, expert witness fees, and interest.
The underlying acts by the Bihm parties that constitute “unfair methods of competition,” “unfair or deceptive acts” began with the misappropriation of Deca’s confidential computer information regarding customers and the business conducted with those customers, sometime during November 2010, and continued into December 2010, during the start-up of Bihms’ business, and for as long as the Bihm parties continued to conduct business using Deca’s trade secret information. On its face, the claims asserting LUTPA violations filed on January 17, 2012, against T. Bihm, and later against S. Bihm and BCS on October 23, 2013, more than one year following those acts were perempted. The Bihm parties contend that because the time period in which to bring a LUTPA claim is peremptive, the doctrine' of contra non valentem does 'not apply, and cannot be used to suspend a peremptive period, citing as authority Zeigler, 118 So.3d at 452. However, three first circuit appellate cases have held that where there is a continuing violation of LUTPA, the per-emptive period does not begin to run until the violation ceases. Fox v. Dupree, 633 So.2d at 614 (where this court held that although the one-year period in LUTPA is peremptive, plaintiffs actions constituted a continuing violation of) sn LUTPA so that “[e]very day he was not in compliance .with the law, plaintiff violated the statute.” Similarly, in Benton, Benton, & Benton v. Louisiana Public Facilities Authority, 95-1367 (La. App. 1 Cir. 4/4/96), 672 So.2d 720, writ denied, 96-1445 (La. 9/13/96), 679 So.2d 110, this court also held that LUT-PA’s peremptive period cannot begin to run as long as violations of LUTPA continue. See also: Crump v. Sabine River Auth., 98-2326 (La. 6/29/99), 737 So.2d 720, 728 (that held that Louisiana law allows for the continuing tort theory to apply in cases where there has been an ongoing violation of the law); Capitol House Preservation Co. v. Perryman Cons., Inc., 98-2216 (La. App. 1 Cir. 11/5/99), 745 So.2d 1194, writ denied, 1999-3446 (La. 2/11/00), 754 So.2d 937.
A continuing tort is occasioned by continual unlawful acts and for there to be a continuing tort there must be a continuing duty owed and a continuing breach of that duty. Crump, 737 So.2d at 729. The facts of this case warrant a finding that T. Bihm’s acts in violation of LUTSA and LUTPA were a continuing .tort. The Bihm parties had the continuing duty to reirain from acquiring or. misappropriating the trade secret information of Deca and to refrain from disclosing such trade secret information to other persons. Moreover, after acquiring such confidential, and protected information, each and every time the Bihm parties used that information to gain a competitive advantage over Deca and its customers constituted a separate breach of that duty. Likewise, under LUT-PA, the Bihm parties had the duty to refrain from engaging in unfair methods of competition and unfair or deceptive acts or practices in the conduct of. trade or commerce. Each and every time the Bihm parties used the data and other trade secret information taken from Deca to conduct business with BCS’s customers constituted a separate breach of that duty. Accordingly, peremption did not run on Deca and, Callaway’s claim against them for violations of LUTPA until the wrongful acts ceased to occur. In this case, the Bihm parties continued to violate both acts through the date of this litigation. Accordingly, in this case, peremption on the claims asserted under LUTPA did not begin to run. Therefore, the Bihm parties’ *490 claim that the LUTPA claims were per-empted is meritless.
Moreover, the LUTSA claims are subject to a three-year prescriptive period, which unlike LUTPA, clearly is not peremptive, as reflected by the language of the statute] B1 Louisiana Revised Statutes 51:1436 provides the prescriptive period for a claim pux’suant to LUTSA: “An action for misappropriation must be brought within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered.” As noted earlier in our discussion of the Bihm parties’ exception of prescription raised in defense of the allegations of misappropriation and conversion of Deca funds, the date on which Callaway and Deca discovered or should have known of the wrongful acts committed by the Bihms was sometime in August 2010, when the newly hired bookkeeper, Ms. Cockerham, discovered and brought to Callaway’s attention the numerous discrepancies in the books of the company, and the possibility that those discrepancies arose from wrongful acts by T. Bihm and S. Bihm. Thus, the LUTSA claims could have been properly and timely filed within three years of August 2010. The re-conventional demand in which allegations constituting LUTSA violations were asserted, January 17, 2012, was well within the three-year prescriptive period in which to file LUTSA claims.
Therefore, the Bihm parties’ contention that the claims against them are prescribed has no merit. Additionally, we find the record more than amply supports the district court’s expressed and specific findings of the several acts and ways that the Bihm parties violated both LUTSA and LUTPA, to the specific detriment of Calla-way and Deca. The district court provided thorough and detailed references to the evidence in the record that support that finding. We find it unnecessary to re-analyze the evidence because our thorough review of the record and the district court’s analysis thereof fails to reveal any manifest error. The district court’s written reasons are adopted herein by reference hereto. The district court’s findings that Callaway and Deca proved the essential elements of the claims under LUTSA and LUTPA, and also proved that these violations caused damages to them is hereby affirmed.
Amount of Damages Awarded
However, we find the district court erred in awarding Deca the entire amount of the business acquired by the Bihm parties after T. Bihm’s separation from Deca, particularly in light of evidence in the record that some of the BCS customers that | .^previously had done business with Deca would have done business with BCS irrespective of, and for reasons other than those arising out of, the improper and unlawful acts that gave the Bihm parties an unfair advantage, allowing them to unfairly solicit the business from Deca’s customers.
Specifically, the record contains the testimony of Cary Higdon, the warehouse manager for Turner Industries and the employee in charge of the calibration of the instruments used by Turner Industries. Mr. Higdon testified that Turner Industries had done business with Deca for over ten years, and that throughout those ten years, the contact person with whom he dealt with at Deca was T. Bihm. According to Mr. Higdon, when he became aware that T. Bihm had left Deca and was in business for himself, he made the decision, on behalf of Turner Industries, to do business with T. Bihm at BCS based on the ten-year experience and positive working relationship he developed with T. Bihm by doing business with Deca. Mr. Higdon testified that all of his business with Deca *491 had been through T. Bihm. Mr. Higdon noted that Turner Industries also continued to do some business with Deea after T. Bihm left. However, based on the prior positive working relationship he had developed with T. Bihm while he was at Deca, whom he testified “does good work” and “provides Turner with good service,” he chose to send a significant amount of Turner’s business to BCS.
The record also contains the testimony of Trae Weaver, who in 2003 started Gulf Coast TMC, and sent the company’s calibration business to Deca for approximately eleven years. He stated that throughout those eleven years, T. Bihm was his primary contact person at Deea and with whom he developed a business relationship. Mr. Weaver testified that when he became aware that T. Bihm had left Deca and started his own company, he made the decision to continue to do business with T. Bihm and his new company because T. Bihm had always been the “go-to” person at Deca with whom he had established a good working relationship. Mr. Weaver testified that previously, Deca and Gulf Coast TMC had developed a pricing agreement under which they did business, and that he initially continued to do business with both Deca and T. Bihm, with the expectation that Deca would continue to honor the pricing agreement. However, he also | ¡^testified that once he began sending some of his business to T. Bihm, Deea contacted him and refused to continue to honor that pricing agreement. At that point in time, he essentially ceased doing business with Deca, instead, sending all of his calibration business to T. Bihm.
The record also contains the deposition of Robert McGowan, the equipment and warehouse manager for MMR Constructors, Inc. (MMR), another Deca customer who admitted to sending business to BCS following the Bihms’ start-up of BCS. Mr. McGowan’s duties for MMR included ensuring that the company’s equipment is properly maintained and making the decisions regarding who MMR contracted with for maintenance work relative to its equipment. He testified that MMR began using Deca and another company he identified as “JM Test” for calibration work sometime in 2000 and that T. Bihm was the person with whom he dealt at Deca, and he had always been pleased with the way T. Bihm conducted his work. However, Mr: McGowan claimed that, although T. Bihm personally came to his place of business attempting to solicit business after leaving Deca, MMR continued to do business with Deca and “JM Test.” Mr. McGowan testified that he did not send business to BCS until he eventually ceased doing business with Deca for reasons wholly unrelated to T. Bihm’s solicitations or offers. Following the Bihms’ opening and operating of BCS, Mr. McGowan testified that MMR had a disagreement or “business altercation” with Deca and Callaway based on Mr. McGowan becoming aware that Deea was talking badly about T. Bihm and BCS, which Mr. McGowan did not think was proper. He testified that he attempted to speak more than once with Callaway and to Callaway’s son at Deca to complain to them about the rumors he heard about them talking badly about T. Bihm and BCS. When he and Callaway could not come to agreement concerning those allegations, Mr. McGowan made the decision to cease all business with Deca. MMR continued to send business to “JM Test” and also began sending business to BCS. Mr. McGowan, numerous times in his deposition testimony, reiterated that MMR’s departure from Deca as a client was wholly caused by his personal disagreement with Callaway, and had nothing at all to do with T. Bihm or the opening of BCS. It was only after MMRlS4 withdrew from do *492 ing business with Deca that MMR entered into business contracts with BCS.
Based on the foregoing testimony, the record provides sufficient evidence to rebut the calculation by expert Mr. Gagnet, of damage to Deca as a result of the Bihm parties’’ unlawful actions. That calculation included the full amount of business that all of Deca’s former customers did with the Bihm parties during the years 2011 through 2014 that was attributed to the unfair advantage gained by the Bihm parties-as a result of the misappropriation of Deca’s trade secret information and unlawful use thereof to solicit the business of Deca customers. In light of the unrefuted testimony of the aforementioned three customers that;they would have sent their business to T. Bihm based on a prior business relationship, or reasons based on a dissatisfaction with Deca wholly unrelated to T. Bihm. or his wrongful actions, we. find it was error to include any of the amount of BCS’s business profits from those customers in the calculation of business lost by Deca as a result of T. Bihm’s unlawful acts. Therefore, we amend the amount of damages awarded to Deca and Callaway by excluding the amount of business that Turner Industries, Gulf Coast TMC, and MMR did with the Bihm parties from 2011 through 2014 from the calculation of Deca’s losses. Those amounts, reflected in Exhibit 6 of the expert report of Ronald Gagnet, are $74,566.00 from Turner Industries; $216,609.00 from Gulf Coast TMC; and, $21,577,00 from MMR, totaling $312,752.00 that was erroneously attributed as base damages for business lost by Deca in the award of $739,319.00. Accordingly, that base .damage award is amended downward to $426,567.00.
Lastly, John Thomas, owner and operator of TCS Sales, LLC, testified that in approximately, 1994-95, TCS began using Deca’s services for recertification of TCS’s test equipment. From the inception of TCS’s business relationship with Deca, Mr. Thomas’s primary contact and the person with whom he conducted TCS’s business with Deca was T. Bihm. He testified that T. Bihm contacted him after his departure from Deca to solicit TCS’s business for BCS and offered to charge him the same amount Deca had been charging. Mr. Thomas testified that in order to “keep everybody happy ... stay friends with everybody,” he decided to split part of TCS’s business between Deca and BCS. | asHowever, shortly thereafter, Mr, Thomas testified that he received a call from a Deca employee questioning him about the reduced amount of work TCS was sending Deca and specifically asking whether and why he was doing business with BCS. Moreover, Mr. Thomas testified that Deca later contacted some of his customers and offered to do work straight with them without their need of having to go through TCS. Mr. Thomas also understood that Deca informed TCS’s customers they were being overcharged for their calibration work by using TCS; At that point in time, sensing that Deca was attempting to undercut TCS’s business, Mr. Thomas ceased doing any business with Deca and continued to do TCS’s business with-BCS.
We find this evidence establishes that at least some, approximately 50 percent, of the loss suffered by Deca of TCS’s business was caused, initially,-as a result of the Bihm parties’ wrongful acts. However, TCS ceased doing business with Deca entirely thereafter based solely on Deca’s actions toward TCS and involving TCS’s customers, and having nothing to do with T. Bihm. Despite questioning, Mr. Thomas was unable .to specify exactly when he ceased doing business with Deca entirely, but in his deposition testimony he stated that, he received the call from Deca inquiring. about TCS doing business with,BCS sometime after he began sending business *493 to both companies. And then, sometime after that, he became aware that Deca was improperly contacting and attempting to take TCS’s customers’ business. He also stated that he began sending business to BCS approximately four months after T. Bihm contacted him. Therefore, we find the only loss of TCS’s business that Deca lost as a result of the Bihm parties’ actions was the period of time prior to TCS’s issue with Deca, which was the sole reason TCS ceased doing business with Deca. After that time, any business TCS did with BCS was wholly attributable to Deca’s actions and not to the Bihm parties’ wrongful acts. Although the amount of time and, thus, the dollar amount of the business loss is undet-erminable with complete accuracy, the record provides data upon which an award can be reasonably made. The documentary evidence—Exhibit 6 to Mr. Gagnet’s expert report—provides an annual total for the amount of business each customer did with BCS for each year from 2011 through 2014. Given Mr. Thomas’s testimony concerning his business dealings with BCS [36and Deca, it can be reasonably estimated that for the year 2011 (BCS’s first year in operation), the amount of business TCS did with BCS can be attributed to the Bihm parties’ wrongful acts. Thus, that amount reflected as $4,378.00 is the only amount properly awarded as a business loss to Deca resulting from the Bihm parties’ acts. Accordingly, the district court erred in awarding Deca and Callaway $78,347.00 representing the entirety of the amount of business BCS did with TCS over the four year period. Accordingly, the total base amount awarded to Deca and Callaway is further reduced by the amount of the loss of TCS’s business attributable solely to Deca’s and not to the Bihms’ wrongful acts, or $73,969.00, rendering the base award for damages totaling $352,598.00.
Finally, we find the district court did not manifestly err in finding Deca and Calla-way entitled to treble damages under LUTPA, La. R.S. 51:1409, based on a finding, supported by the record, that the wrongful acts were knowingly taken by the Bihm parties after being put on notice by the attorney general to cease such wrongful acts. Thus, the trebling of the base award of damages is affirmed; however, that total amount is modified by now trebling the reduced amount of the base award as amended by us in this appeal, for a total of $1,057,794.00.
MOTION TO SUPPLEMENT THE APPELLATE RECORD AND ANSWER TO APPEAL
Pending before this court is a motion to supplement the record filed by the Bihms seeking to supplement the appellate record with an exhibit (Bihm Exh. 106) they claim was omitted as an exhibit in the record on appeal. The transcript in this record reveals that the district court verbally ordered that particular exhibit be entered into the record as properly admitted. Thus, it appears the omission from the record on appeal of this exhibit was erroneous, and to that extent, we grant the motion to supplement. Additionally, we note that the exhibit, containing financial documentation regarding bank account activity, receipts, invoices, etc., as proof of the misappropriation by the Bihms of Deca’s and Callaway’s funds, is cumulative of many other exhibits and testimony properly included in the appellate record, prior to the inclusion by supplementation of Bihm Exh. 106. Thus, the omission itself, prior to subsequent supplementation granted by this court at this time) 37 would be harmless error at best. In any event, the motion is granted and this court has considered that exhibit together with the plethora of exhibits tending to prove the same improper acts committed by the Bihms to the detriment and damage to Deca and Callaway.
*494 Additionally, Deca and Callaway nave filed an answer to the appeal seeking an increase in the base amount of the damages awarded as well as trebling the increased base amount. Given our determination that the base amount awarded was erroneously excessive in that it included damages attributed to certain customers where the record contained proof that those customers would have transferred their business to the Bihm parties independent of any improper methods or acts employed by the Bihms, we find no merit to the answer filed by the defendants seeking additional damages. We also note that the answer summarily asserts the damages were insufficient, but provides no specifics as to how or why, based on the record before us, the damages awarded were insufficient. In any event, the claim for additional damages is denied.
CONCLUSION
Accordingly, and for all the foregoing reasons, the July 15, 2015 judgment is hereby amended to reduce the amount of base damages awarded by $386,721.00, thus amending the total amount of base damages awarded from $739,319.00 to $352,598.00, and trebling that amount for a total award of $1,057,794.00. The July 15, 2015 judgment is otherwise affirmed as amended. Costs of appeal are assessed equally: 50 percent to Timmy Bihm, Shelly Bihm, and Bihm Calibration Services, L.L.P. and 50 percent to Gerald Callaway and Deca Systems, Inc.
MOTION TO SUPPLEMENT GRANTED; JULY 15, 2015 JUDGMENT AMENDED IN PART; AND AFFIRMED AS AMENDED; ANSWER TO APPEAL DENIED.
McDonald, I concur

. We note that BCS did not file a separate appellate brief; the brief filed on behalf of the appellants reflects that it was filed by counsel "for Timmy and Shelly Bihm." The motion and order for appeal contained in the record seeks appeal on behalf of Timmy Bihm, Shelly Bihm, and BCS. Moreover, the arguments and discussions in the appellants’ brief refer to BCS where relevant and applicable. Thus, notwithstanding counsel's notation in brief, we find it clear that the brief was offered in support of, and is applicable to, all three parties seeking the appeal.

. The reconventional demand was erroneously captioned as a Counterclaim; however, a pleading is governed by its substance rather than its caption and must be construed for what it really is, not for what it is erroneously designated. Belser v. St. Paul Fire and Marine Ins. Co., 542 So.2d 163, 165-66 (La. App. 1 Cir. 1989). There is no dispute that the pleading is, substantively, a reconventional demand.

. Although the pleading expressly sets forth four counts (which do not include LUTSA)— LUTPA, breach of- fiduciary duty/loyalty, intentional interference with business relations, and revendicatory action—paragraph thirteen of that pleading alleges specific facts—that T. Bihm misappropriated Deca’s "proprietary and/or trade secret information”—thus, asserting a LUTSA claim as well.